[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 21, 2007
THOMAS K. KAHN
CLERK

_____

No. 05-12906

_____

D.C. Docket No. 03-02671-CV-T-30MAP

CUSTOM MANUFACTURING AND ENGINEERING, INC.,

Plaintiff-Appellant,

versus

MIDWAY SERVICES, INC.,
AUTOMATED ENGINEERING CORPORATION,
MDCO, INC.,
NTU ELECTRONICS, INC. et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(November 21, 2007)**

Before TJOFLAT, BARKETT and HILL, Circuit Judges.

TJOFLAT, Circuit Judge:

The claims alleged in this trademark infringement case surfaced during the litigation of a contract action between Custom Manufacturing and Engineering, Inc. ("Custom") and Midway Services, Inc. ("Midway") in Florida state court. Custom had agreed to design for Midway a water meter reading system to be installed in residential complexes, but Midway had cancelled the contract (on the ground that Custom had breached it) and hired Automated Engineering Corporation ("AEC"), MDCO, Inc. ("MDCO"), NTU Electronics, Inc. ("NTU"), and engineers to finish the job. Custom sued for damages, and Midway counterclaimed, alleging breach of contract.

During the discovery phase of that lawsuit, Custom learned that the water meter reading system that had been installed had used printed circuit boards that had been modified from the design it had created, but retained a printed legend containing Custom's trade name. Armed with this discovery, Custom brought this lawsuit, claiming trademark infringement against Midway, AEC, MDCO, and NTU, and tortious interference with a business relationship against AEC and the engineers involved in modifying the circuit boards.

On considering the defendants' motions for summary judgment, the district court found that Custom had failed to establish the likelihood that the purchasing

2

public would be confused by the presence of Custom's trade name on the circuit boards and therefore dismissed Custom's trademark infringement claim. As for Custom's tortious interference claim, the district court dismissed the claim as meritless and imposed sanctions on Custom's counsel under Federal Rule of Civil Procedure 11. We find no error in the district court's grants of summary judgment or an abuse of discretion in a discovery ruling Custom challenges, and therefore affirm the district court's judgment in all respects.

The relevant facts are presented in Part I of this opinion. Part II summarizes Custom's claims and the procedural background of this appeal. Part III analyzes the substance of Custom's arguments and concludes that they are without merit.

I.

Founded in 1997, Custom is a privately-held technology company that provides research and development, engineering, software, and manufacturing services to the government and industrial markets. Midway is a contractor of plumbing, electrical, submetering, and air conditioning services. AEC and MDCO are contract electronic manufacturers, and NTU is a manufacturer of printed circuit boards.[1]

---

[1] Each party to this appeal is a Florida corporation that has its principal place of business in Florida.

Midway wished to market a system that could remotely read the water meters installed in each unit of multiple-unit residential complexes such as apartment buildings. In early 1998, Midway contracted with Custom to design and manufacture such a system. Custom designed a system that used radio waves to gather and transmit water usage data, and consisted of four components: meter transmitters, transceivers, repeaters, and collectors. Each of these components was to contain a two-inch by three-inch printed circuit board. Custom, in turn, contracted with NTU to manufacture and supply these circuit boards, and also contracted with MDCO to assist with affixing components on the circuit boards and assembling other system parts.[2] Custom specified that the circuit boards manufactured by NTU were to contain a legend with Custom's trade name. Appearing in small, plain font in the upper left-hand corner of each circuit board were the words: "MFG by Custom Manufacturing and Engineering, Inc., for Midway Services, Inc."[3] Each of the circuit boards was fully encased in an opaque

[2] A manufacturer of a printed circuit board typically begins with the artwork or electronic data, which are called Gerber files. The manufacturer will then use machining processes, chemical plating processes, screening processes, and photo imaging processes to create the final board. Components, such as transistors and batteries, are typically added by others.

[3] Although Custom contends that the circuit boards also included its logo, we are unable to locate any such logo in the extremely low-quality, black-and-white photographs which constitute the only record depiction of the circuit boards in question. Nor were we able to locate any mention of a logo on the circuit boards in the affidavit of Custom's president, Dr. Nancy Crews, cited in Custom's brief. The existence of such a logo ultimately matters not, given our disposition of this case in part III, infra.

plastic housing unit. Midway marketed the system to owners and managers of apartment buildings in several states.

Although the system prototype had functioned properly, in the fall of 1998 Midway reported to Custom that the system was malfunctioning. Unsurprisingly, the parties disagree as to the reason; Midway believes that the fault lay in the design of the transceiver component, while Custom chalks up the problem to Midway's improper installation of the system. In early 1999, with Custom's knowledge, Midway retained Judd Sheets to evaluate the system and diagnose the problem. Sheets professed unfamiliarity with the system and requested permission to consult with Genium, Inc. ("Genium") and its president, James Stosic. Together, Sheets and Stosic determined that there were flaws in the design of the transceiver component and recommended that it be redesigned. Because Sheets and Stosic were too busy to create a modified design themselves, they referred Midway to two other engineers, James Baughman and Randy Bell, to do the job. Sheets and Stosic met with Baughman and Bell to discuss their recommendations. Sheets's involvement with the entire matter lasted less than a month, while Stosic's involvement was approximately half that time.

To the extent possible, Baughman and Bell sought to incorporate the components of the original system in the modified design. They decided to

5

redesign the original transceiver component so that it would function only as a receiver.  Meanwhile, the relationship between Midway and Custom soured as a result of Custom's alleged inability to adhere to the delivery schedule, causing Midway to begin looking for a new supply source.  In April 1999, Midway issued a purchase order to AEC for the component parts of the original system.  AEC, in turn, contacted NTU to manufacture the circuit boards for the components.  Because NTU would not provide circuit boards to AEC using Custom's tools and test fixtures, Midway sent NTU the necessary information to construct the circuit boards.  Although the record is unclear as to what process of manufacture was used, NTU apparently duplicated all of the markings on the original circuit boards, including the legend containing Custom's trade name.

On June 16, 1999, Midway sent a letter to Custom that terminated the contract and instructed Custom to stop all work.  Later that month, Midway learned that MDCO had previously supplied some components as a contract manufacturer for Custom.  Midway contracted directly with MDCO to supply 1000 transmitters, which were constructed using circuit boards manufactured by NTU.  None of the defendants noticed that the circuit boards that NTU supplied to AEC and MDCO – approximately 6000 or 7000 in total – retained the legend with Custom's trade name.  By July 1999, Baughman and Bell completed their redesign

of the new receiver component. This new receiver used a new circuit board that was not manufactured by NTU and did not contain the legend.

In 1999, Custom sued Midway in Florida state court for breach of contract. Midway countersued. Discovery in that action unearthed the use of Custom's trade name on the circuit boards supplied to AEC and MDCO, and this litigation ensued.

## II.

On December 22, 2003, Custom brought suit in the United States District Court for the Middle District of Florida against the defendants in this appeal and against Sheets, Stosic, and Genium. Count 1 of Custom's complaint alleged unfair competition in violation of section 43(a) of the Lanham Act, 15 U.S.C. §§ 1051 et seq.[4] Count 2 alleged violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 et seq.[5] Finally, Count 3 alleged that AEC, Stosic, Genium, and Sheets tortiously interfered with a business

---

[4] In pertinent part, 15 U.S.C. § 1125(a)(1)(A) proscribes a person's use in commerce of any "false designation of origin, false or misleading description of fact, or false or misleading representation of fact," which is "likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."

[5] Fla. Stat. § 501.204(1) provides that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

relationship in violation of Florida law.

The court granted summary judgment in favor of the defendants with respect to Counts 1 and 2. The court also granted summary judgment in favor of AEC, Sheets, Stosic, and Genium on Count 3, and imposed sanctions on Custom's counsel pursuant to Federal Rule of Civil Procedure 11. Custom timely appealed the judgment on Counts 1 and 2 only, and the district court's order denying Custom's motion to compel discovery relating to Midway's customers.

We review a district court's grant of summary judgment de novo and apply the same legal standards as the district court. Summary judgment is appropriate where, viewing the evidence (all "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," Fed. R. Civ. P. 56(c)), and all reasonable factual inferences drawn therefrom in the light most favorable to the non-moving party, there remains no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See Johnson v. Bd. of Regents, 263 F.3d 1234, 1243 (11th Cir. 2001) (citation omitted). Summary judgment is mandated where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. (quotation marks and citation omitted).

**III.**

Count 1 of Custom's complaint alleged a claim pursuant to section 43 of the Lanham Act, codified as 15 U.S.C. § 1125. "Section 43(a) of the Lanham Act creates a federal cause of action for unfair competition" in interstate commerce, and "forbids unfair trade practices involving infringement of . . . trademarks, even in the absence of federal trademark registration." Univ. of Florida v. KPB, Inc., 89 F.3d 773, 775–76 (11th Cir. 1996) (per curiam).[6] Unlike the general prohibition against unauthorized copying that exists in patent and copyright law, see B.H. Bunn Co. v. AAA Replacement Parts Co., 451 F.2d 1254, 1258 (5th Cir. 1971) ("The patent and copyright laws exist to prevent copies from being produced at all, without the consent of the registered holder."),[7] the touchstone of liability in a trademark infringement action is not simply whether there is unauthorized use of a protected mark, but whether such use is likely to cause consumer confusion. See id. at 1259 ("Outright copying is often a civilizing rather than a cannibalizing folkway. The world would be a duller place without the

---

[6] The Lanham Act defines a trademark as "any word, name, symbol, or device, or any combination thereof," which is used by a person "to identify and distinguish his or her goods . . . from those manufactured or sold by others." 15 U.S.C. § 1127.

[7] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

originators, but it would not work without the copyists. . . . Whatever the legal competitive rights one might have to copy and to sell the works originated by another, the copyist, if state law so requires, cannot 'palm off' his copied goods as the genuine goods of the originator, to the deceit of the purchasing public."); see also B&L Sales Assocs. v. H. Daroff & Sons, Inc., 421 F.2d 352, 353 (2d Cir. 1970) (noting that "the federal remedy against trademark infringement is not plenary, and is only available when the plaintiff can show a likelihood of confusion, mistake or deception arising in the market as a result of defendant's use of the mark registered to plaintiff").

Specifically, Custom alleged a false designation of origin claim, which proscribes the behavior of "passing off" or "palming off," which "occurs when a producer misrepresents his own goods or services as someone else's." Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 28 n.1, 123 S. Ct. 2041, 2045, 156 L. Ed. 2d 18 (2003). To establish a prima facie case under § 1125(a), a plaintiff must show (1) that the plaintiff had enforceable trademark rights in the mark or name, and (2) that the defendant made unauthorized use of it "such that consumers were likely to confuse the two." Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc., 106 F.3d 355, 358 (11th Cir. 1997); see Sun America Corp. v. Sun Life Assurance Co. of Canada, 77 F.3d 1325, 1334 (11th Cir. 1996).

With respect to the second element, we consider seven factors in assessing whether or not the "likelihood of confusion" exists: (1) the type of mark (in short, whether the "relationship between the name and the service or good it describes" is such that the chosen name qualifies as generic, descriptive, suggestive, or arbitrary); (2) the similarity of the marks (based on "the overall impressions that the marks create, including the sound, appearance, and manner in which they are used"); (3) the similarity of the goods ("whether the products are the kind that the public attributes to a single source"); (4) the similarity of the parties' retail outlets, trade channels, and customers ("consider[ing] where, how, and to whom the parties' products are sold"); (5) the similarity of advertising media (examining "each party's method of advertising" to determine "whether there is likely to be significant enough overlap" in the respective target audiences such "that a possibility of confusion could result"); (6) the defendant's intent (determining whether the defendant had a "conscious intent to capitalize on [the plaintiff's] business reputation," was "intentionally blind," or otherwise manifested "improper intent"); and (7) actual confusion (that is, whether there is evidence that consumers were actually confused). Frehling Enters., Inc. v. Int'l Select Group, Inc., 192 F.3d 1330, 1335–41 (11th Cir. 1999).

The district court's discussion of Count 1 eschewed analysis of the first

element concerning the validity of Custom's mark and proceeded directly to the second element, the likelihood of confusion. The court entered summary judgment for the defendants based on its determination that the "fatal weakness in Custom's claim is that there is no evidence of any likelihood of confusion," which is an "essential element." Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc., No. 8:03-cv-2671-T-30MAP, 2005 U.S. Dist. LEXIS 45267, at *14–15 (M.D. Fla. May 31, 2005).[8]

---

[8] The district court's silence with respect to the first element is presumably due to the fact that the defendants did not dispute the validity of Custom's mark. Although "we may affirm the district court's decision on any adequate ground, even if it is other than the one on which the court actually relied," Parks v. City of Warner Robins, 43 F.3d 609, 613 (11th Cir. 1995), we are unable to do so on the ground that Custom lacked enforceable trademark rights in its trade name because of the evidentiary lacunae in the record. A more methodical analysis potentially could have resulted in summary judgment for the defendants based on the threshold inquiry of whether Custom had a protectible interest in its trade name, thereby rendering the likelihood-of-confusion inquiry superfluous. See, e.g., Gift of Learning Found., Inc. v. TGC, Inc., No. 01-08069-CIV-HURLEY, 2001 U.S. Dist. LEXIS 25301, at *30 (finding that because the mark DRIVE PITCH & PUTT was merely descriptive and lacked secondary meaning, the plaintiff had no protectible interest in its mark, and thus "there is no need to engage in an analysis of likelihood of confusion between the two marks") (S.D. Fla. Oct. 31, 2001), aff'd, 329 F.3d 792 (11th Cir. 2003) (per curiam).

In particular, we are somewhat perplexed by the defendants' concession that the first factor of the second element – the type of mark – supports Custom's claim. Generally speaking, a mark falls into one of four categories based on the terms it uses, which in order of increasing strength are: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. See Frehling Enters., Inc. v. Int'l Select Group, Inc., 192 F.3d 1330, 1335–36 (11th Cir. 1999). This categorization is also relevant to the first element of whether a plaintiff has enforceable rights in the mark. Generic marks "may never be registered as trademarks under the Lanham Act," while descriptive marks are entitled to protection only if "the holder shows that the mark has acquired 'secondary meaning.'" Dieter v. B & H Indus. of Sw. Fla., 880 F.2d 322, 328 (11th Cir. 1989); see also Jellibeans, Inc. v. Skating Clubs of Georgia, Inc., 716 F.2d 833, 841 n.19 (11th Cir. 1983) (noting that "the true legal standard is not simply the 'likelihood of confusion' but rather the 'likelihood of unreasonable confusion,'" in that "'reasonable' confusion is generated by the legitimate efforts of a business to convey vital information to the public about the basic nature of

Custom argues that the district court misapplied the seven factors articulated in <u>Frehling Enterprises</u>.  Indeed, the district court made no mention of these factors at all.  While a more systematic approach would have aided our review of such a fact-intensive inquiry, we find that analysis of the factors here is ultimately

---

one's business, and to invite comparison with one's competitors").  Relevant factors in determining whether a mark has taken on secondary meaning are: "(1) the length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made by [the user of the mark] to promote a conscious connection in the public's mind between the name and [the user's] product or business; and (4) the extent to which the public actually identifies the name with the [user's] product or venture."  <u>Conagra, Inc. v. Singleton</u>, 743 F.2d 1508, 1513 (11th Cir. 1984).

Custom contends that its trade name "must be considered at least suggestive, if not arbitrary and fanciful."  Custom is a purveyor of research and development, engineering, software, and manufacturing services tailored to the needs of its clients.  It seems to us that the mark "Custom Manufacturing and Engineering," at worst, is a generic mark in the sense that its terms denote the "genus or class" to which Custom's goods and services belong, <u>see</u> <u>Dieter</u>, 880 F.2d at 327 (quoting <u>Vision Ctr. v. Opticks</u>, 596 F.2d 111, 115 (5th Cir. 1979)) (quotation marks omitted); and, at best, is descriptive of a characteristic or quality of the goods and services provided by Custom, which would place it in the descriptive category.  <u>See</u> <u>Frehling</u>, 192 F.3d at 1335 (noting, for example, that the term "vision center" denotes a place where glasses are sold, and is thus a descriptive mark); <u>see also</u> <u>In re Steelbuilding.com</u>, 415 F.3d 1293, 1299–1301 (Fed. Cir. 2005) (affirming the refusal of the Patent and Trademark Office to register the mark STEELBUILDING.COM, because the mark was descriptive of online services for the design of steel buildings, and lacked secondary meaning).  Unlike the case with suggestive marks, no "effort of the imagination by the consumer" is required to connect those terms with the particular goods and services provided by Custom.  <u>See</u> <u>Frehling</u>, 192 F.3d at 1335 ("For instance, 'penguin' would be suggestive of refrigerators.").

By their concession, the defendants argued neither that Custom's trade name was generic and wholly ineligible for trademark protection, nor that it was descriptive and protectible only if Custom could discharge its "burden of sustaining a high degree of proof establishing secondary meaning for a descriptive term."  <u>See</u> <u>Gift of Learning Found.</u>, 2001 U.S. Dist. LEXIS 25301, at *25.  The district court did note that there was no evidence that Custom's mark was registered with the Patent and Trademark Office, <u>see</u> <u>id.</u> at *23 (noting that a mark that has become "incontestable" through five years of substantially exclusive and continuous use after registration is presumed to be "at least descriptive with secondary meaning"), and some evidence indicated that Custom is a small company with little or no national presence.  However, given the absence of a dispute as to this issue and the overall state of the record, we decline to affirm the summary judgment on the ground that Custom lacked enforceable trademark rights in the mark at issue.

13

unnecessary to affirm the district court's ruling.

Because the bottom line is the likelihood of consumer confusion, application of the Frehling factors entails more than the mechanistic summation of the number of factors on each side; it involves an evaluation of the "overall balance." See Frehling, 192 F.3d at 1342; see also Jellibeans, Inc. v. Skating Clubs of Georgia, Inc., 716 F.2d 833, 840 n.17 (11th Cir. 1983) ("We note that the district court should not determine whether a likelihood of confusion exists by merely computing whether a majority of the subsidiary facts indicates that such a likelihood exists. Rather, the district court must evaluate the weight to be accorded the individual subsidiary facts and then make its ultimate fact decision."). We have consistently held, for example, that "[t]he type of mark and evidence of actual confusion are the most weighty of considerations." Hi-Tech Pharms., Inc. v. Herbal Health Prods., Inc., 132 Fed. Appx. 348, 350 (11th Cir. 2005) (per curiam). Moreover, while these seven subsidiary findings typically inform a court's determination of the likelihood of confusion, a court must also take into account the unique facts of each case. As the Sixth Circuit has observed:

> These factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely. They are also interrelated in effect. Each case presents its own complex set of circumstances and not all of these factors may be particularly helpful in any given case. . . . The ultimate question remains whether relevant consumers are likely to believe that the products or services offered

14

by the parties are affiliated in some way.
Homeowners Group, Inc. v. Home Mktg. Specialists, Inc., 931 F.2d 1100, 1107 (6th Cir. 1991).

This case does not resemble the paradigmatic "passing off" case. The goods on which Custom's mark was affixed were subcomponents manufactured for use in a product that was marketed to apartment complex owners and managers, not to Custom's customers. No more of the circuit boards bearing Custom's trade name were made after July 1999 – when Baughman and Bell had completed their redesign of the transceiver component – and an unknown number of components containing the putatively offending circuit boards have subsequently been replaced. Thus, the question in this case involves the likelihood of confusion in the post-sale context – namely, whether Custom's or Midway's potential customers are likely to be confused as to the origin of the extant circuit boards. See United States v. Torkington, 812 F.2d 1347, 1352 (11th Cir. 1987) (noting that under the "likely to confuse test" of § 1114(1), the relevant audience is the "purchasing public," which includes both "those who are potential direct purchasers of the allegedly counterfeit goods" and "potential purchasers of the trademark holder's products who encounter allegedly counterfeit goods in a post-sale context – for example, in a direct purchaser's possession").

Custom's trade name cannot be viewed without first removing the opaque plastic housing units that completely cover the circuit boards in question. Moreover, the particular circuit boards in question correspond only to the components in the system that were originally designated as transceivers. Transceivers are located in two places: the attic of the building (to receive messages from the apartment transmitters and send this data to the repeater boxes or collector boxes) or the outside of the building (to receive messages from repeater boxes and relay the signal to an adjacent building). Because the system utilizes radio transmission, the transceivers are normally mounted as high as possible in attics, roofs, and exterior walls to reduce transmission interferences. We therefore find that it is unlikely that the apartment owners and managers to whom Midway sold the water meter reading systems would remove these covers and examine the circuit boards contained therein.

Custom argues that persons other than apartment owners and managers are likely to be confused by the circuit boards. Specifically, they contend that repair technicians would believe that the circuit boards were manufactured by Custom, as would fire marshals or other officials who might view the water meter reading system in the event of a fire. This argument does not cut the mustard. In the first place, neither repair technicians nor fire marshals can properly be regarded as the

customers – either actual or potential – of Custom or Midway.[9]  Second, even if such persons qualified as the relevant purchasing public, Custom failed to proffer sufficient record evidence in support of its allegations.  While there is no bright line test to determine the existence of a likelihood of consumer confusion, recovery under the Lanham Act requires, at a minimum, "that confusion, mistake, or deception be 'likely,' not merely 'possible.'"  Sears Roebuck & Co. v. All States Life Ins. Co., 246 F.2d 161, 168 (5th Cir. 1957); see also New Sensor Corp. v. CE Distribution LLC, 303 F. Supp. 2d 304, 310–11 (E.D.N.Y. 2004) (noting that a plaintiff must show "a probability, not just a possibility, of confusion," meaning "a likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question") (internal quotation marks and citations omitted); We Media Inc. v. Gen. Elec. Co., 218 F. Supp. 2d 463, 479 (S.D.N.Y. 2002) ("Some confusion is always possible; but there must be some threshold quantum that crosses from mere possibility into a probability.").  See also Dieter v. B & H Indus. of Sw. Fla., 880 F.2d 322, 326 n.3 (11th Cir. 1989) ("There are no hard and fast rules as to how

---

[9] In some cases, to hew too closely to the distinction between purchasers and users unduly constricts the scope of trademark liability.  Where the direct purchaser is not the intended user and has purchased the goods or services for use by others, the likelihood-of-confusion inquiry extends to those foreseeable users.  See, e.g., Montgomery v. Noga, 168 F.3d 1282, 1301–02 & n.33 (11th Cir. 1999) (collecting cases).  Such is manifestly not the case here, as neither repair technicians nor fire marshals qualify as the foreseeable users of the products in question.

much evidence of confusion is enough.  Rather, when looking at the evidence the court must take into consideration the circumstances surrounding each particular case.").

The water meter reading systems were initially installed and maintained by Midway technicians who would not be confused as to the subject circuit boards' origin.  Construing the facts in the light most favorable to Custom, we assume that Midway ceased servicing an unknown number of the systems for various reasons.  Even with the benefit of that assumption, however, there is insufficient proof of a likelihood of confusion by third-party repair technicians.  The circuit boards, like everything under the sun, may not be fail-safe; but there is insufficient proof that it was likely that third-party technicians would view and be confused as to the origin of the circuit boards, as opposed to the possibility that the systems would be replaced entirely by new ownership, or that the apartment complexes would be shut down before any circuit board malfunction, or any number of other eventualities.  Without evidence in the record to support these allegations, we decline to supply the deficiency by simply taking judicial notice of such "facts" as likely.  "[T]hese types of facts are not of the type that may be judicially noticed anyway; for example, they are not matters of authentic public record and are not otherwise 'capable of accurate and ready determination by resort to sources whose

accuracy cannot reasonably be questioned.'" See Frehling, 192 F.3d at 1341 n.4 (quoting Fed. R. Evid. 201(b)(2)). The other scenario posited by Custom – that in the event that one of the apartment complexes in question catches fire, a fire marshal or official might suspect the water meter reading system was the cause and might open up the component to view the putatively offending circuit board – similarly rests upon too many contingent possibilities to support a finding that a likelihood of confusion exists.

Custom proposes that the proper inquiry is whether purchasers who have seen putatively offending circuit boards are likely to be confused. Custom thus seeks to omit the antecedent question of whether purchasers are likely to see the circuit boards at all. We reject such a theory of infringement in a vacuum, as liability under the Lanham Act is properly tied to the real-world context in which the alleged trademark use occurs. Cf. Homeowners Group, Inc., 931 F.2d at 1106 (noting that the likelihood-of-confusion inquiry must consider "the operative facts of the real world" and "the performance of the marks in the commercial context," and cautioning that the "appearance of the litigated marks side by side in the courtroom does not accurately portray actual market conditions") (internal quotation marks and citation omitted). Like the proverbial tree falling in a forest, the unauthorized use of a trademark that is never perceived by anyone cannot be

said to create a likelihood of consumer confusion.

We touched upon the converse of this notion in Montgomery v. Noga, 168 F.3d 1282 (11th Cir. 1999). In that case, the plaintiff was the author of VPIC, a software program for viewing pictures on the computer, which the defendants had incorporated as a utility on their CD-ROM discs. Id. at 1286–87. Pointing to the plaintiff's trial testimony that users "never would even know that VPIC was on there," the defendants argued that the jury erred in finding a likelihood of user confusion based upon the defendants' use of the VPIC mark. Id. at 1301–02. In rejecting this argument, we relied on evidence that "users who did not have one specific brand of video card in their computers would need to visit the defendants' CD help menu before engaging in [the] viewing process." Id. at 1302. The VPIC term appeared on the help menu, where users were provided instructions on how to set up VPIC or another picture-viewing utility. Id. Thus, the fact that the express reference to VPIC occurred on the help menu – which was readily accessible and intended for viewing by users – supported the likelihood of consumer confusion.[10] The instant appeal presents facts at the opposite end of the

_____

[10] The physical context in which a mark appears also enters into the likelihood-of-confusion analysis in cases where a mark appears alongside a house brand. For example, in AutoZone, Inc. v. Tandy Corp., 373 F.3d 786 (6th Cir. 2004), the plaintiff alleged that the defendant's use of the POWERZONE mark infringed on its AUTOZONE mark. Id. at 791. In assessing the similarity of the marks, the Sixth Circuit found "significant" the fact that the POWERZONE mark almost always appeared "in close physical proximity" with the Radio Shack house mark "such that a consumer would be unlikely to see one without the other," thereby

spectrum. We therefore affirm the judgment of the district court as to Count 1.

Plaintiff's failure to establish a likelihood of confusion as to its Lanham Act claim also extinguishes its claim under Florida law. See Gift of Learning Found., Inc. v. TGC, Inc., No. 01-8069-CIV-HURLEY, 2001 U.S. Dist. LEXIS 25301, at *30 (S.D. Fla. 2001) (citing Investacorp, Inc. v. Arabian Inv. Banking Corp., 931 F.2d 1519, 1521 (11th Cir. 1991), for the proposition that "the analysis of the Florida statutory and common law claims of trademark infringement and unfair competition is the same as under the federal trademark infringement claim"), aff'd, 329 F.3d 792 (11th Cir. 2003) (per curiam); Planetary Motion, Inc. v. Techplosion, Inc., 261 F.3d 1188, 1193 n.4 (11th Cir. 2001) ("Courts may use an analysis of federal infringement claims as a 'measuring stick' in evaluating the merits of state law claims of unfair competition."); Marco's Franchising, LLC v. Marco's Italian Express, Inc., No. 8:06-cv-00670-T-17-TGW, 2007 U.S. Dist. LEXIS 49211, at *10 (M.D. Fla. July 9, 2007) (analyzing the plaintiff's FDUTPA claim simultaneously with the plaintiff's Lanham Act claim because the former is "derivative of" the latter). Defendants are thus entitled to summary judgment with

---

reducing the likelihood that consumers would be confused as to the source of the products. Id. at 790, 796.

21

respect to Count 2.[11]

**IV.**

For the reasons herein stated, the judgment of the district court is

**AFFIRMED.**

---

[11] Custom also claimed that the district court abused its discretion regarding its motion to compel. Specifically, after the close of discovery, and on the same day that the defendants filed their summary judgment motions, Custom filed a motion to compel Midway's corporate representative to provide the names and contact information of the representatives of customers to whom the water meter reading systems in question had been sold. An existing order in the pending state court action barred Custom from having any contact with Midway's customers. The magistrate judge denied Custom's motion to compel, and the district court did not modify or set aside that order prior to granting summary judgment for the defendants. We have reviewed Custom's claim that the district court abused its discretion in adopting the magistrate judge's ruling, and find it to be without merit.