[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 09-14480
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEP 02, 2011
JOHN LEY
CLERK

D.C. Docket  No. 7-01323-CV-ORL-22-KRS

KNIGHTS ARMAMENT COMPANY,
a Florida sole proprietorship,

Plaintiff-Appellee-
Counter-Defendant,


versus


OPTICAL SYSTEMS TECHNOLOGY, INC.,
a Pennsylvania corporation,

Defendant-Appellant-
Counter-Claimant-
Third Party Plaintiff.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(September 2, 2011)

Before TJOFLAT, CARNES and HILL, Circuit Judges.

HILL, Circuit Judge:

Appellant Optical Systems Technology, Inc. (OSTI) and Appellees Knights

Armament Company (KAC), and its owner, C. Reed Knight, Jr., dispute the ownership of two trademarks used in the manufacturing and marketing of clip-on night vision devices: "Universal Night Sight" and "UNS."[1] This appeal consists of two parts: the part that was disposed of by the district court upon summary judgment, and the part that was tried to the bench over a four-day period.[2] We affirm the judgments of the district court on both aspects of this litigation.

## I.

It is undisputed that the origination, development, and design of these night vision devices, described as Universal Night Sight and UNS, began with OSTI in 1996. Although OSTI had the unique ability to manufacture these devices, it needed the marketing skills of KAC, an established supplier of arms to the military, to sell them. A relationship between OSTI and KAC began sometime in 1998 or 1999, when the United States Department of Defense Special Operations Command (the government) contracted with KAC for delivery of four of the night vision devices. OSTI manufactured them, and KAC delivered them to the

---

[1] The Universal Night Sight and UNS products were devices that clipped on top of miliary rifles, in front of a daylight magnifying scope, enabling snipers to see targets in low light conditions. Typical consumers for such a product were the military, federal governmental agencies, and local law enforcement agencies.

[2] Only the basic facts will be repeated here as they are adequately set forth in the district court opinion on summary judgment. *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 636 F.Supp.2d 1283, 1285-89 (M.D.Fla. 2009).

2

government.[3]  The relationship between OSTI and KAC ran smoothly for several

years.  KAC, as principal contractor, would deliver the night vision devices to the

government, manufactured by OSTI, as principal subcontractor.[4]

In May 2002, by contract, the government requested delivery of 300 night

vision devices (the 8506 contract) from KAC.  KAC and the government executed

a second contract (the 8512 contract), in September 2002, for delivery of over

1000 more devices.[5]  KAC and OSTI maintained this harmonious, mutually

---

[3] Interestingly, the devices delivered to the government actually contained the mark "KNIGHTSCOPE," owned by KAC, not UNS or Universal Night Sight.

[4] After testing the initial four devices, the government requested certain changes be made to the model prototype.  OSTI manufactured four more devices, incorporating the requested changes.  KAC delivered them to the government, also marked KNIGHTSCOPE.

[5] In each section of KAC's contractual proposals to the government, OSTI's intellectual property rights statement appeared on the cover, reading:

> The Universal Night Sight (UNS) has been developed entirely by [OSTI] funds and OSTI maintains all right, title, and interest in and to the UNS.  Nothing contained in this proposal or as a result of any contract issued as a result of this proposal shall convey, transfer, assign any right or interest, whatsoever, in the UNS to the United States Government or any other party.

However, an executive summary, written by OSTI's president, Paul F. Maxin, also appeared in KAC's contractual proposals to the government.  It stated:

> [KAC] is pleased to propose the Universal Night Sight™ . . . . The Universal Night Sight™ (Knightscope Model 007) is the product of over six years of design, development, test [sic], and modification as a result of feedback from operational use in the field . . . . In 1998, KAC[,] having extensive experience with small arms, weapon mounts, ergonomics, and device hardening, combined resources with OSTI to further develop the Universal Night Sight . . . . KAC and OSTI have developed all production processes, procedures and tooling as well as installed the latest environmental . . . and optical test[s] . . . in support of a current Universal

3

beneficial relationship until March 2003. When KAC and OSTI met to discuss the requirements of the government 8512 contract, a dispute arose as to who owned the clip-on night vision scope technology.

KAC claimed that it co-owned the technology because it helped modify, test, and pay for the technology from prototype to completed product. OSTI claimed that it, on its own and without input from KAC, solely made modifications, tested, and bore the cost of developing the final night vision device product.

Tensions increased when the government threatened to pull out of contracts 8506 and 8512, unless and until KAC and OSTI resolved their ownership dispute. KAC and OSTI, for the moment, repaired their relationship, and completed delivery of 1300 of the devices to the government under the two contracts.[6]

Things came to a head when, in May 2003, KAC filed its intent to use federal trademark applications for the marks "Universal Night Sight" and "UNS" with the United States Patent and Trademark Office (USPTO) and the State of

---

Night Sight™ production contract for the Army.

[6] When KAC offered another subcontractor, Optics 1, Inc. (Optics 1), to the government to replace OSTI on contracts 8506 and 8512, the government rejected KAC's offer, insisting upon OSTI as principal subcontractor. During this same time period, KAC was apparently developing its own competing device, using Optics 1 as subcontractor.

Florida.[7] Upon notice of KAC's actions, OSTI filed a notice of cancellation with the Trademark Trial and Appeal Board (TTAB) at the USPTO to cancel KAC's federal trademark registration for UNS. It itself then applied for federal trademarks for "UNS" and "Universal Night Sight." KAC filed oppositions with the TTAB to cancel OSTI's trademark applications.

In an aggressive, proactive move, in August 2007, KAC filed a seven-count complaint in federal district court against OSTI for: (1) trademark infringement in violation of the Lanham Act, 15 U.S.C. §§ 1051, *et seq.*, 1114, and 1116-1118 (Count I); (2) unfair competition and false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a) (Count II); (3) false advertising in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a) (Count III); (4) trademark infringement in violation of Fla. Stat. § 495.151, *et seq.*, (Count IV); (5) misleading advertising in violation of Fla. Stat. § 817.41 (Count V); (6) common law unfair competition (Count VI); and (7) deceptive and unfair trade practices in violation of Fla. Stat. § 501.201, *et seq.* (Count VII).

A year later, in August 2008, OSTI filed a four-count second amended

---

[7] KAC received a federal trademark registration for UNS and state trademark registrations for UNS and Universal Night Sight. It reapplied for the Universal Night Sight mark with the USPTO.

counterclaim against KAC and Knight.[8]  The second amended counterclaim alleged:  (1) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1125(a) (Counterclaim Count I); (2) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a) (Counterclaim Count II); (3) common law unfair competition (Counterclaim Count III); and (4) misappropriation of trade secrets in violation of Florida's Uniform Trade Secrets Act (FUTSA), Fla. Stat. §§ 688.01-09 (Counterclaim Count IV).[9]  All patent and trademark administrative proceedings were suspended pending the outcome of the district court action.

KAC moved for partial summary judgment in its favor on OSTI's Counterclaim Count IV regarding the FUTSA, using statute of limitation grounds as its affirmative defense.  OSTI moved for summary judgment in its favor on all seven counts of KAC's complaint.

The district court granted summary judgment in KAC's favor on Counterclaim Count IV.  After a four-day bench trial, the district court found that

---

[8] OSTI's first four-count counterclaim had been filed on December 21, 2007.

[9] As to Counterclaim Count IV, OSTI alleges that, in connection with the government contracts, it provided KAC with its proprietary information, but did not authorize KAC to use OSTI's proprietary information for any other purpose.  OSTI further claims that KAC misappropriated trade secrets when it developed a competing device using OSTI's drawings.  Most notably, OSTI's tolerances (regarding allowable manufacturing variances, measured in thousandths of an inch, from the specified dimensions of the device's main housing), were of great value.  OSTI contends that its tolerances were what allowed OSTI, and no other subcontractor, to efficiently and reliably manufacture the night vision devices.

KAC would take nothing on its seven counts. It found that OSTI would take nothing on its three remaining counter-claim counts.

OSTI appeals.

## II.

We review the district court's entry of partial summary judgment in favor of KAC on OSTI's misappropriation of trade secrets counterclaim *de novo* applying the same standards as the district court. *See Morton's Mkt, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 827 (11th Cir. 1999). We review the district court's findings of fact for clear error. *See Frehling Enters., Inc. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999).

## III.

Under Florida law, OSTI has the right to seek injunctive relief or damages to remedy KAC's alleged misappropriation of OSTI's trade secrets. Fla. Stat. § 688.002(4) defines a trade secret as:

> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process that:
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

7

*Id.*

> Misappropriation is defined as:
>
> (a) Acquisition of a trade secret by another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (b) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
> &ast;&ast;&ast;
>
> 2. At the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was:
>
> &ast;&ast;&ast;
>
> b. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

Fla. Stat. §§ 688.002(2). FUTSA also provides that "[a]n action for misappropriation must be brought within 3 years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." Fla. Stat. § 688.007.

KAC asserts that the three-year statute of limitations had run. KAC argues that the evidence proves that OSTI knew of or should have discovered, by the exercise of reasonable diligence, KAC's alleged trade secret misappropriation as early as April 2003, or, at least by mid-2004. Therefore, KAC contends, as OSTI did not file its initial counterclaim until December 21, 2007, more than three years

8

after the period April 2003 to mid-2004, it is time-barred.[10]  Fla. Stat. § 688.007.

OSTI counters that, although it had heard rumors in the marketplace, and, it had suspicions about KAC's alleged misappropriation of its trade secrets, it was not until March 2006, that it actually discovered KAC's misconduct, when an OSTI employee first viewed KAC's competing device at a trade show.[11] Alternatively, OSTI argues that whether or not it knew, or should have discovered that KAC misappropriated its trade secrets prior to the expiration of the three-year statute of limitations, or, on or before December 21, 2004, is a genuine issue of a material fact for a jury, not one to be resolved on summary judgment.

In its opinion, the district court found that this circuit has not addressed the issue of when a trademark infringement claimant is deemed to have knowledge of "or by the exercise of reasonable diligence should have discovered a misappropriation of its trade secrets under [FUTSA]." *Knights Armament Co.*, 636 F.Supp.2d at 1293.  "However, federal district courts construing [FUTSA] have found that interpretations of other states' identical or similar UTSA

---

[10] As alternative arguments, KAC contends that OSTI has not produced sufficient evidence to prove that its tolerances were a valuable trade secret under FUTSA; that KAC misappropriated these trade secrets; or that OSTI suffered any damages.

[11] OSTI contends that it has produced enough evidence for a reasonable factfinder to conclude that its tolerances were in fact valuable trade secrets; that KAC misappropriated these trade secrets; and that OSTI suffered damages as a result.

provisions are persuasive." *Id.*, citing *Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 136 F.Supp.2d 1271, 1292 (S.D.Fla. 2001) (finding the Eighth Circuit's interpretation of Iowa's UTSA "particularly applicable" as it was identical to the FUTSA); *Porex Corp. v. Haldopoulos*, 644 S.E.2d 349, 354 (2007) (interpreting Georgia's identical UTSA, except as to length of time). Courts have typically found that suspicion and concerns alone are insufficient to start the running of the statute of limitations. *See, e.g., Sokol Crystal Prods., Inc. v. DSC Commc'ns Corp.*, 15 F.3d 1427, 1430 (7th Cir. 1994); *Spectralytics, Inc. v. Cordis Corp.*, 576 F.Supp.2d 1030, 1059-60 (D.Minn. 2008).

The district court concluded that it need not reach this issue. Based on the evidence in the record, and drawing all inferences in favor of OSTI, the district court found it unnecessary to determine whether or not OSTI's suspicions alone, with or without a followup investigation, could trigger the statute of limitations under the FUTSA.[12]

The district court held, as a matter of law, that OSTI's trade secret misappropriation claim was barred by the statute of limitations, by OSTI's own

---

[12] We have found no published case to date holding that, while suspicion alone does not start the statute of limitations running, if suspicion is present, and, a reasonable investigation would have confirmed this suspicion, then the limitation period begins, whether or not an investigation was ever conducted.

damaging admissions during discovery, both in its answer to Interrogatory 21; by Maxin's deposition testimony; and by letters OSTI sent during 2004, seeking reassurance from KAC's owner, Knight; from Kenneth Greenslade, KAC vice-president; and, from Optics 1. We agree.

OSTI filed its original counterclaim on December 21, 2007. If OSTI knew, or by the exercise of reasonable diligence should have known, of KAC's alleged trade secret misappropriation before December 21, 2004, OSTI's claims would be barred by the FUTSA's statute of limitations. *See* Fla. Stat. § 688.007.

In OSTI's verified third supplemental response to KAC's Interrogatory 21, KAC requested that OSTI indicate when it became aware of KAC's alleged misappropriation of its trade secrets. OSTI stated in the record, under oath:

> OSTI first became aware of [KAC's] intent to misappropriate OSTI's confidential information and trade secrets when [Knight] stated in a meeting that [KAC] and OSTI shared the UNS™ technology and [Maxin] stated that Knight was incorrect and that OSTI alone owned the technology. OSTI learned through the *April 21, 2003 letter* from [the government] to KAC, a copy of which . . . was emailed to OSTI on *May 28, 2003[,]* that [KAC] had attempted to misappropriate OSTI's UNS™ drawings. Furthermore, KAC and Knight deliberately removed OSTI's proprietary markings from OSTI's UNS™ drawing being supplied to the [g]overnment in connection with the [8512 contract] proposal . . . and attempted to substitute KAC markings. After the [g]overnment identified this malfeasance, it alerted OSTI to KAC's wrongful activities and directed KAC to secure permission to remove OSTI's markings from same. On information and belief, KAC provided OSTI's UNS™ drawings and technology to third

11

parties, including Optics 1, for the purpose of attempting to copy OSTI's UNS™ product. OSTI strongly suspected that KAC had misappropriated its trade secrets pertaining to the tolerances on the main housing when OSTI learned that KAC was offering a UNS that had been manufactured by either KAC or some third party, and actually saw and handled that device in the last week of March 2006.

(Emphasis added.)

Also, during this April-May, 2003 time frame, OSTI's president Maxin testified that KAC's proposal to substitute Optics 1 as principal subcontractor, used components of OSTI's system for manufacturing the main housing of the clip-on night vision device. Maxin also testified that drawings for KAC's competing device used OSTI tolerances and were taken from drawings that OSTI gave KAC. Maxin's testimony is further evidence that indicates that OSTI knew KAC had misappropriated its tolerances as early as April-May, 2003, well before the December 21, 2004, statute of limitations deadline.

Further evidence is found in a February 24, 2004, letter from OSTI to KAC, from Maxin to Knight, seeking reassurance that OSTI's proprietary intellectual property would not be compromised. A March 1, 2004, response letter from KAC vice-president Adkins to Maxin stated that KAC "would not allow any compromise of the discussed OSTI drawings or data" and that "all material received from OSTI and so marked were collected and have been quarantined in

12

my office files." Although OSTI was not satisfied with Adkins' response, it did nothing to try to disprove it.[13]

In the summer of 2004, OSTI also sent multiple letters to Optics 1's president, Dane Hileman, again seeking reassurance. In August, 2004, Optics 1 responded in writing that it had no knowledge of any improper conduct by KAC.

In October 19, 2004, Lloyd Conley, OSTI's Chief Operating Officer, wrote KAC vice-president Greenslade a similar letter seeking reassurance and a meeting. Greenslade refused to comment on OSTI's allegations of KAC impropriety but indicated he was amenable to a meeting. No followup to meet in person was ever made by either party.

During 2003 and 2004, Maxin testified that OSTI had heard rumors in the marketplace (and even received anonymous tips) that KAC was developing a competing night vision device. Yet OSTI or Maxin did nothing. They did not do their due diligence. It is incredible that, through discovery, they damningly admit, on the record, that they knew or suspected KAC's alleged misappropriation as

---

[13] In OSTI's brief and at oral argument, OSTI argues that KAC's "fraudulent concealment" actions tolled the statute of limitations. As this argument was raised for the first time on appeal, it is waived, and not preserved for appeal. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004). The same is true of OSTI's so-called "compulsory counterclaim" argument. *Id*.

early as March 2003.[14]  In so doing, they lose on this issue.

Under *de novo* review, the district court was correct in concluding as a matter of law that OSTI's trade secret misappropriation counterclaim (Count IV) was barred by the statute of limitations.  *See Morton's Mkt., Inc*, 198 F.3d at 827. It correctly granted summary judgment to KAC on OSTI's Count IV, based upon undisputed facts in the record.  We affirm.

## IV.

The district court then turned to OSTI's pending motion for summary judgment on all counts of KAC's complaint.  *Knights Armament Co.*, 636 F.Supp.2d at 1296.  The first issue concerned the ownership of the marks, "UNS" and "Universal Night Sight."  OSTI claims that the evidence indicates that it first used the marks in 1999 and 2000, well before KAC's first use in 2002.  The district court agreed. It determined that OSTI owned the marks as a "prior owner."

---

[14] In the Joint Final Pretrial Statement, OSTI agreed to the burden of proof that KAC was required to meet in order to prevail on its FUTSA statute of limitations affirmative defense. OSTI agreed that:

> To prove the affirmative defense of the expiration of the statute of limitations under FUTSA, KAC must establish that OSTI knew, *suspected,* or by the exercise of reasonable diligence *should have known or suspected* that KAC had engaged in trade secret misappropriation more than 3 years prior to OSTI bringing its Counterclaim in this matter.

(Emphasis added.)

It granted this part of OSTI's motion for summary judgment on July 7, 2009.

On all other issues, the district court determined that genuine issues of material fact remained, so OSTI's motion was denied in all other respects, and the case proceeded to a four-day bench trial, July 13-16, 2009. *Id*. at 1302-03.

V.

We now examine the bench trial dispositions that the district court made in its Memorandum Decision and Order entered August 19, 2009. The only remaining issues on appeal concern OSTI's claims against KAC and Knight under 15 U.S.C. § 1125(a) for trademark infringement, and for unfair competition, under both the statute and common law.[15]

Previously, on summary judgment, the district court determined that KAC could not prevail on its claims that OSTI infringed on KAC's rights in the Universal Night Sight and UNS marks, as the undisputed evidence indicated that no genuine issue of material fact precluded the court from finding that OSTI was the first entity to use those marks in commerce. In terms of seniority, OSTI was the prior owner; OSTI owned the marks. The district court did not consider whether OSTI possessed enforceable rights in the marks, Universal Night Sight and UNS, and did not consider the extent of OSTI's ownership rights in the marks,

---

[15] OSTI did not appeal its trade dress infringement claim.

as that issue was not before the district court on summary judgment.

The only issue remaining at the bench trial was, for purposes of 15 U.S.C. § 1125(a), what was the extent of OSTI's protected ownership rights in the marks.[16] Under the statute, 15 U.S.C. § 1125(a)(1)(A), were the marks that OSTI owned, UNS and Universal Night Sight, "confusingly similar" to the marks that KAC owned, Knightscope, Universal Knightscope and UKS?[17] Distinctiveness is a question of fact. *See Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1357 (11th Cir. 2007). In its Memorandum Decision and Order, the district court conducted a thorough legal analysis of the distinctiveness of the mark "Universal Night

---

[16] 15 U.S.C. § 1125(a)(1)(A) reads:

(a) Civil Action
(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which --
    (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person
    . . .
shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

[17] Whether a party has "a protectable interest in its trade name" is a "threshold inquiry" that may render "the likelihood-of-confusion inquiry superfluous." *See Custom Mfg. and Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 648 n.8 (11th Cir. 2007), citing *Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 800 (11th Cir. 2003).

16

Sight/UNS" and how it should be classified.[18]

The district court concluded that Universal Night Sight/UNS was a "descriptive" mark, and hence not entitled to trademark infringement protection. The judgment of the district court was that OSTI would take nothing from KAC or Knight. On appeal, we view this decision for clear error. *See Frehling Enters., Inc.*, 192 F.3d at 1335.

VI.

Actual substantive rights to a trademark arise based on its use in commerce and its distinctiveness. *See Investacorp, Inc. v. Arabian Inv. Banking Corp.*, 931 F.2d 1519, 1522 (11th Cir. 1999). Trademark or service mark protection "is only available to distinctive marks, that is, marks that serve the purpose of identifying the source of the goods or services." *See Welding Servs., Inc.*, 509 F.3d at 1357.

The law in this circuit is clear that the four categories of distinctiveness in trademark law, listed in descending order of strength, are: (1) fanciful or arbitrary; (2) suggestive; (3) descriptive; and (4) generic. *Id.; Custom Mfg. and Eng'g. Inc. v. Midway Servs., Inc.*, 508 F.3d 641, at 648 n.8 (11th Cir. 2007); *St. Luke's Cataract and Laser Inst. v. Sanderson*, 573 F.3d 1186, 1208 (11th Cir. 2009).

---

[18] The district court found UNS to be an abbreviation of Universal Night Sight, and used interchangeably; it is not an independent mark.

This circuit has noted that "[t]he demarcation between each category is more blurred than it is definite." *Coach House Rest., Inc. v. Coach and Six Rests., Inc.*, 934 F.2d 1551, 1559 (11th Cir. 1991).

An "arbitrary or fanciful" mark bears no logical relationship to the product it represents. *See Welding Servs., Inc.*, 509 F.3d at 1357. "A ['suggestive'] mark refers to some characteristic of the goods, but requires a leap of the imagination to get from the mark to the product." *Id*. at 1357-58. "Because a suggestive [trademark] is inherently distinctive, no proof of secondary meaning is required for it to be protectable." *Coach House Rest., Inc.*, 934 F.2d at 1560.

A "descriptive" mark identifies a characteristic or quality of the product. *See Welding Servs., Inc.*, 509 F.3d at 1358. A descriptive mark is not inherently distinctive, and receives protection only if it acquires secondary meaning. *See Coach House Rest., Inc.*, 934 F.2d at 1560; *Investacorp*, *Inc.*, 931 F.2d at 1522.

"A name has acquired secondary meaning when the primary significance of the term in the minds of the [consuming] public is not the product but the producer." *Welding Servs., Inc.,* 509 F.3d at 1358. The determination of whether a mark has acquired secondary meaning depends on "the length and nature of the name's use, the nature and extent of advertising and promotion of the name, the efforts of the proprietor to promote a conscious connection between the name and

18

the business, and the degree of actual recognition by the public that the name designates the proprietor's product or service." *Id*. The existence of a secondary meaning is a question of fact. *See Coach House Rest., Inc*., 934 F.2d at 1560.

A "generic" mark describes the class to which a good belongs. *Id*. It is afforded no trademark protection because it is not distinctive and cannot acquire secondary meaning. *Id*.

Here the district court found that "Universal Night Sight/UNS" was not a suggestive mark as a customer in the relevant community can readily perceive the nature of the product, that is *night sight, or the ability to see at night*, without having to use his or her imagination. The court found the words "night sight" were a generic term used in the sniper community to refer to the genus of goods that enable a sniper to observe or acquire a target at night. It found the word "universal" to be descriptive. The court found the mark as a whole, "Universal Night Sight/UNS," to be merely descriptive, unworthy of protection at this point.

The court then turned to an analysis of whether or not the descriptive mark "Universal Night Sight/UNS" had acquired secondary meaning, enabling it to rise up the ladder of protection. *See Welding Servs., Inc.*, 509 F.3d at 1358. Four factors to determine whether a descriptive mark has acquired secondary meaning are: "(1) the length and manner of its use; (2) the nature of advertising and

19

promotion; (3) the efforts made by the user of the mark to promote a conscious connection in the public's mind between the name and the user's product or business; and (4) the extent to which the public actually identifies the name with the user's product or venture." *Custom Mfg., Inc.*, 508 F.3d at 648 n.8. The party seeking trademark protection must demonstrate that its mark acquired secondary meaning *before* the alleged infringer first began using the mark. *Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 800 (11th Cir. 2003) (emphasis added); *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1195 (11th Cir. 2001).

The district court determined that OSTI first used the marks in 1999 and 2000; KAC first used the marks in 2003. The court found that any confusion in the marketplace was not due to infringement on KAC's part, but was caused by the failure of both parties to identify clearly their respective marks from 1997 to 2003. As there was no indication that the UNS/Universal Night Sight mark belonged to OSTI, and not KAC, consumers had no reason to associate OSTI's mark with its product, and not KAC. Therefore, under the law of this circuit, it was impossible for the mark to have acquired secondary meaning prior to KAC's first use of the mark in 2003. *Id.* Universal Night Sight/UNS was therefore a descriptive mark, without secondary meaning, not entitled to protection.

20

The district court found KAC not liable for trademark infringement.[19] The court issued judgment providing that OSTI shall take nothing from KAC or Knight.

## VII.

We agree. OSTI owns the mark. Yet, as the mark is a descriptive mark, without secondary meaning, OSTI has no protectable rights in the mark. KAC cannot be liable for trademark infringement based on rights to a mark that OSTI cannot enforce. *See Custom Mfg.*, 508 F.3d at 648 n.8. The district court committed no clear error.

After oral argument and a thorough review of the record, we affirm the district court in all respects.

AFFIRMED.

---

[19] As the district court concluded that OSTI did not have enforceable rights in the Universal Night Sight/UNS mark prior to KAC's first use of the mark, OSTI does not prevail on its remaining unfair competition counterclaims.