**CASA DIMITRI CORP. d/b/a Dimitri & Co., and Technomarine, S.A., Plaintiffs,**

v.

**INVICTA WATCH COMPANY OF AMERICA, INC., TM Brands, LLC, Eyal Lalo, and Technomarine USA, Inc., Defendants.**

**TM Brands, LLC, a Florida Limited Liability Company, Counter–Plaintiff,**

v.

**Casa Dimitri Corp. d/b/a Dimitri & Co., a Florida Corporation; Dimitri & Company Eye Wear, Inc., a Florida Corporation; Dimitri Lampru, Individually, Counter–Defendants.**

**Case No. 0:15–CV–21038–KMM**

United States District Court, S.D. Florida.

Filed September 15, 2017

Beshoy Rizk, Roberto Zarco, Alejandro Brito, Zarco, Einhorn, Salkwoski & Brito, P.A., Miami, FL, for Plaintiffs.

Glen H. Waldman, Michael Sayre, Waldman Barnett, P.L., Coconut Grove, FL, for Defendants.

## OMNIBUS ORDER

K. MICHAEL MOORE, CHIEF UNITED STATES DISTRICT JUDGE

THIS CAUSE came before the Court upon Defendants Invicta Watch Company of America, Inc. ("Invicta"), TM Brands, LLC ("TM Brands"), Eyal Lalo ("Lalo")

and Technomarine USA, Inc.'s (collectively "Defendants") Motion for Summary Judgment (ECF No. 229), and upon Counter–Plaintiff TM Brands' Motion for Summary Judgment as to Liability (ECF No. 228). The Motions are now ripe for review.[1] For the reasons set forth below, Defendants' Motion for Summary Judgment is granted and Counter–Plaintiff's Motion for Summary Judgment is granted in part and denied in part.

## I. BACKGROUND

### A. Factual Background [2]

Technomarine, S.A. was a Swiss watch company and original owner of the Technomarine trademarks. *See* Plaintiffs' Statement of Undisputed Material Facts ("Pls.' 56.1") (ECF No. 235) ¶ 1. Technomarine, S.A. licensed the use of those trademarks to Casa Dimitri Corp. d/b/a Dimitri & Co. ("Casa Dimitri") through a License Agreement. *Id.* Both Casa Dimitri and Plaintiff Dimitri Eyewear are companies incorporated in Florida. *See* Defendant's Statement of Undisputed Material Facts ("Defs.' 56.1") (ECF No. 229) ¶ 4. Demetrio Lampru personally runs, operates, and exercises control over Casa Dimitri and Dimitri Eyewear. *See* CP's 56.1 ¶ 10 n.3 (citing Lampru Dep. (ECF No. 228–10) at 263–264).

As licensee, Casa Dimitri sold Technomarine eyewear, including in the United States. Defs.' 56.1 ¶ 4. Casa Dimitri was also involved in the development and manufacture of eyewear products bearing the Technomarine mark. *Id.* ¶ 5. Casa Dimitri used an Italian manufacturer—Industria Occhiala Vista E Sole ("IOVES")—to manufacturer the Technomarine eyewear. *Id.* IOVES is a non-exclusive manufacturer. *Id.* ¶ 6. Enrique Martini, working on behalf of Casa Dimitri, created sketches of eyewear designs, which IOVES would render into a computerized model. Defs.' 56.1 ¶ 7; Pls.' 56.1 ¶ 7. The Parties dispute the role IOVES had in the design process. Defs.' 56.1 ¶ 8; Pls.' 56.1 ¶ 8. The Casa Dimitri Parties maintained a website on which they advertised and sold Technomarine eyewear. Defs.' 56.1 ¶ 10. The website was created in 2008 or 2009 and was public to everyone world-wide, including in the United States. *Id.* Casa Dimitri did not register copyrights for their eyewear designs with the United States Patent and Trademark Office ("USPTO"). Defs.' 56.1 ¶ 9; Pls.' 56.1 ¶ 9.

In December 2014, Technomarine, experiencing financial difficulties, instituted reorganization proceedings in Switzerland. Defs.' 56.1 ¶ 1.[3] The Swiss Court appointed

1. Counter–Defendants Casa Dimitri Corp., Dimitri & Co. Eye Wear, Inc, and Demetrio Lampru, (collectively, "Counter–Defendants" or "Casa Dimitri Parties") twice filed a Memorandum of Law in Opposition to Counter–Plaintiff's Motion for Summary Judgment (ECF Nos. 240 and 241). Because these briefs are identical, the Court will refer to the latest filed brief (ECF No. 241). Counter–Plaintiff filed a Reply in Support (ECF No. 254).

Plaintiffs, Casa Dimitri Corp. and Dimitri & Co. Eye Wear Inc. (collectively, "Plaintiffs") thrice filed a Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (ECF Nos. 236, 237, and 238). Because all of these briefs are identical, the

Court will refer to the latest filed brief (ECF No. 238). Defendants filed a Reply in Support (ECF No. 255).

2. The following consists of the relevant undisputed facts from the Parties' statements of undisputed facts along with the supporting documents. Under Local Rule 56, "[a]ll material facts set forth in the movant's statement" of material facts "will be deemed admitted unless controverted by the opposing party's statement, provided that the Court finds that the movant's statement is supported by evidence in the record." L.R. 56.1(b).

3. Plaintiff is unaware of the nature or extent of these financial difficulties. Pls.' 56.1 ¶ 1.

a trustee. Pl. 56.1 ¶ 1. TM Brands purchased all of Technomarine S.A.'s rights to the Technomarine trademarks pursuant to an Asset Purchase Agreement ("APA"), which the trustee signed. *Id.* ¶ 2. Invicta, the managing member of TM Brands, was also a party to the APA. *See* Counter-Plaintiff's Statement of Undisputed Facts ("CP's 56.1") (ECF No. 228) ¶ 3. This Court held that TM Brands purchased the trademarks through the APA unencumbered by the License Agreement. Def. 56.1 ¶ 3 (citing Omnibus Order (ECF No. 162) at 14). This Court also held that the License Agreement was terminated and Casa Dimitri's rights in the Technomarine Marks reverted back to Technomarine, which sold its rights to the marks to TM Brands LLC. *See id.*[4]

The relevant license agreement between Casa Dimitri and Technomarine S.A. provided that, upon termination of the license agreement, Casa Dimitri had the right to continue to sell the products for a six-month period. *See* 2013 License Agreement (ECF No. 239–3) ¶ 18.4. Upon acquiring the marks, TM Brands, who is not a party to the license agreement, did not afford Casa Dimitri this sell-off period. Counter Defendants' Statement of Undisputed Facts ("CDs' 56.1") (ECF No. 239) ¶ 13; *see also* Counter–Plaintiff's Reply Statement of Material Facts ("CP's R 56.1") ¶ 13.

Instead, Technomarine S.A. sent two notices of termination to the Casa Dimitri Parties on May 15, 2015, and June 25, 2015, respectively. *See* CDs' 56.1 ¶ 5.[5] On March 6, 2015, Invicta sent an email to Lampru stating that: "as the new owners of the TechnoMarine trademarks you are not authoriz[ed] to manufacture any products bearing the TechnoMarine trademark

. . . . Any production or importation will be considered Trademark infringement and is unauthorized." *See* CP's 56.1 ¶ 7 (citing (ECF No. 195–5)). On September 1, 2016—following this Court's Omnibus Order (ECF No. 162)—TM Brands sent the Casa Dimitri Parties another cease and desist letter. CP's 56.1 ¶ 8 (citing (ECF No. 195–6)).

The Casa Dimitri Parties do not deny that they continued to market, distribute, and sell Technomarine products after these cease-and-desist letters, but deny that they currently sell Technomarine products. CP's 56.1 ¶ 10; CDs' 56.1 ¶ 10. The Casa Dimitri Parties also sold Technomarine product after the Omnibus Order. CP's 56.1 ¶ 12. Counter–Plaintiffs contends that certain 2017 sales were "small and isolated" sales of spare parts and repair services. CDs' 56.1 ¶ 12. The Casa Dimitri Party's websites were maintained until several days after the August 2016 Omnibus Order. CP's 56.1 ¶ 14; CDs' 56.1 ¶ 14.

In June 2016, the Casa Dimitri Parties sold 5,385 pieces of eyewear to Garage Watches, LLC ("Garagewatches"). CP's 56.1 ¶ 11. Garagewatches, through their legal counsel, sent a letter to Amazon explaining that it acquired Technomarine sunglasses from Casa Dimitri on or about June 17, 2016 based on Casa Dimitri's representation that it held a valid license to sell the sunglasses. CP's 56.1 ¶ 11 (citing (ECF No. 228–01)). Counter–Defendants deny that they presented Garagewatches with a copy of its license agreement or otherwise insinuated that they were a licensee of the Technomarine trademark. CDs' 56.1 ¶ 11. Marita Belfiore, one of Casa Dimitri's retailers, believed (as of the date of her June 5, 2017 deposition) that

---

4. Plaintiffs do not dispute this Court's ruling, but proffer additional facts regarding the proceeding and the APA. *See* Pls.' 56.1 ¶¶ 1–3.

5. The Casa Dimitri Parties challenge the efficacy of these termination notices. CDs' 56.1 ¶¶ 5–6.

Casa Dimitri owned the Technomarine logo and the word "Technomarine" because he was selling her the products. *See* CP's 56.1 ¶ 17 (citing Belfiore Dep. (ECF No. 228–7) at 21:21–25).

After purchasing the marks, Invicta introduced the Technomarine eyewear into its established sales channels. Defs.' 56.1 ¶ 13. Invicta sold eyewear to some of Casa Dimitri's customers, but it is disputed whether Invicta approached any of Casa Dimitri's customers that Invicta had not previously sold to prior to the APA. Defs.' 56.1 ¶¶ 14–15; Pls.' 56.1 ¶¶ 14–15.

**B. Relevant Procedural Background**

Plaintiffs filed the operative complaint in this action on November 7, 2016. *See* Second Amended Complaint ("Compl.") (ECF No. 188). Plaintiffs filed this after this Court entered an order dismissing Plaintiffs' trademark-based claims on August 25, 2016. *See* Omnibus Order (ECF No. 162). Therein, this Court found that Casa Dimitri's rights under the licensing and distribution agreements were terminated by the APA upon the sale of the Technomarine marks to Defendants, and thus Casa Dimitri had no remaining protectable interest in those marks. *Id.* at 14–5. The Court reaffirmed this holding when it denied Casa Dimitri's motion for reconsideration of the dismissal of its trademark claims. (ECF No. 212)

On November 29, 2016, Defendants answered the Second Amended Complaint and Defendant TM Brands filed a counterclaim against the Casa Dimitri Defendants that includes claims of federal and common law trademark infringement. *See* Answer and Counterclaims ("Countercl.") (ECF No. 194).

TM Brands also moved for a preliminary injunction against the Casa Dimitri Parties. *See* Motion for Preliminary Injunction (ECF No. 195). Judge McAliley issued a Report and Recommendation (ECF No.

214), finding that although TM Brands is the registered owner of the Technomarine Marks and there was evidence that the Casa Dimitri Parties had engaged in unauthorized use of the marks, there was no likelihood of irreparable harm because, *inter alia*, there was no evidence that Casa Dimitri was continuing to use the marks (or even that Casa Dimitri had used the marks after June of 2016). *See* Report (ECF No. 214) at 8–10. On April 7, 2017, this Court adopted Judge McAliley's Report and Recommendation, and denied a preliminary injunction against Counter-Defendants. *See* Order Adopting Report and Recommendation (ECF No. 219).

On July 10, 2017 Defendants moved for summary judgment on all claims. See Defendants' Motion for Summary Judgment (ECF No. 229). On the same date, TM Brands also moved for summary judgment as to liability on its counterclaims. *See* Counter-Plaintiff's Motion for Summary Judgment (ECF No. 228).

**II. LEGAL STANDARD**

Summary judgment is appropriate where there is "no genuine issue as to any material fact [such] that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also* Fed R. Civ. P. 56. An issue of fact is "material" if it is a legal element of the claim under the applicable substantive law that might affect the outcome of the case. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). An issue of fact is "genuine" if the record, taken as a whole, could lead a rational trier of fact to find for the non-moving party. *Id.* "For factual issues to be considered genuine, they must have a real basis in the record." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009) (citation omitted).

The moving party has the initial burden of showing the absence of a genuine issue as to any material fact. *See Tyson Foods, Inc.*, 121 F.3d at 646 (citation omitted). In deciding whether the moving party has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the non-moving party. *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001). Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to come forward with evidence showing a genuine issue of material fact that precludes summary judgment. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); *see also* Fed. R. Civ. P. 56(e). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Tyson Foods, Inc.*, 121 F.3d at 646 (citations omitted). But if the record, taken as a whole, cannot lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. DISCUSSION

### A. Plaintiffs' Copyright Infringement Claim (Count I)

 "To establish a claim of copyright infringement, a plaintiff must prove, first, that he owns a valid copyright in a work and, second, that the defendant copied original elements of that work." *Leigh v. Warner Bros.*, 212 F.3d 1210, 1214 (11th Cir. 2000). Additionally, registration of a United States work is a precondition for bringing an action for copyright infringement. *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 157; 130 S.Ct. 1237, 176 L.Ed.2d 18 (2010); *Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*, 856 F.3d 1338, 1339 (11th Cir. 2017); *see* 17 U.S.C. § 411(a) ("[N]o civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title.").

Defendants argue that summary judgment regarding Plaintiffs' copyright infringement claim (Count I) is appropriate because: (1) Plaintiffs have not established ownership of the copyright; (2) Plaintiffs cannot maintain a copyright infringement claim because they have failed to register their works and cannot establish that the works are not United States works; (3) the works are not copyrightable; and (4) Defendants did not infringe on any purported copyrights. Plaintiffs, on the other hand, argue that summary judgment is not appropriate because they have presented sufficient evidence establishing: (a) Mr. Martini's ownership rights of the copyrights in the eyewear designed under Venezuelan law; (b) Plaintiffs' ownership of the copyrights in the eyewear designs pursuant to a valid and enforceable Assignment and Transfer Agreement; (c) the foreign work status of the eyewear designs in question, which exempts such designs from the registration requirements of the Copyright Act; and (d) Defendants' improper and unlawful copying of the copyrighted aspects of the eyewear designs in question.

The Court finds that Plaintiffs have failed to satisfy the registration precondition to bringing a copyright infringement action. Accordingly, the claim fails as a

matter of law and the Court need not address any of the remaining arguments.

It is undisputed that Plaintiffs have failed to register the work at issue within the meaning of the Copyright Act. *See* Defs.' 56.1 (ECF No. 229) ¶ 9 ("it is beyond debatable that Dimitri … never obtained a design patent or any intellectual property protection in the United States (including copyright protection) for the eyewear designs that it alleges that Defendants are infringing upon"); Pls.' 56.1 (ECF No. 235) ¶ 9 (not disputing that Casa Dimitri failed to register the works). Instead, Plaintiffs argue that the precondition does not apply here because the designs at issue are not a "United States work" under the statute, but a foreign work. As a result, Plaintiffs contend, Mr. Martini owned "all copyrights to those designs under Venezuelan copyright law," before "assigning all of his intellectual property rights, including his copyrights to the eyewear designs" to Plaintiffs. Pls.' Opp. (ECF No. 238) at 4–6.

 Even as the non-moving party on a summary judgment motion, a "plaintiff that claims his published work is exempt from the registration requirement must prove that the first publication occurred abroad." *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1304–05 (11th Cir. 2012). "This requires the plaintiff to first prove a publication: that the method, extent, and purpose of the distribution meets the Copyright Act's requirements for publication." *Id.* at 1305. Publication can occur "when an authorized offer is made to dispose of the work in any such manner[,] even if a sale or other such disposition does not in fact occur." *Id.* at 1303. "Once the plaintiff has proven publication, *he must then prove that the publication was, in fact, the first publication*, and that the geographic extent of this first publication diverges from the statutory definition of a 'United States work.'" *Id.* at 1305 (emphasis added). A

"United States work" is defined as work that is first published:

> "(A) in the United States; (B) simultaneously in the United States and another treaty party or parties, whose law grants a term of copyright protection that is the same as or longer than the term provided in the United States; (C) simultaneously in the United States and a foreign nation that is not a treaty party; or (D) in a foreign nation that is not a treaty party, and all of the authors of the work are nationals, domiciliaries, or habitual residents of, or in the case of an audiovisual work legal entities with headquarters in, the United States."

17 U.S.C. § 101.

Plaintiffs fail to meet their burden of demonstrating that the works at issue are exempt from registration. *See Mosley* at 1304–05 (A "plaintiff that claims his published work is exempt from the registration requirement must prove that the first publication occurred abroad."). Plaintiffs conclusorily argue that the first publication of the alleged copyrighted works was in Venezuela, Colombia, and Mexico. *See* Pl. Mot. (ECF No. 238) at 8.

 In support of this contention, Plaintiff cites to Mr. Lampru's testimony purportedly indicating "eyewear models were sold in Mexico, Venezuela, and Colombia before Plaintiffs advertised them on their website." *Id.* However, the Court is unable to verify this statement or discern its source because the sentence is followed by: "See Ex. '__' to SOMF." The Court reviewed the Mr. Lampru deposition exhibit attached to Plaintiff's statement of facts. Nowhere in that deposition does Mr. Lampru make the statement that Plaintiffs attribute to him. Plaintiffs do, however, attach an affidavit from Mr. Lampru, in which he declares that "[c]ontrary to Defendants' claim that the plaintiffs first published the designs of their eyewear models on their eyewear website, the seven eyew-

ear designs that Defendants unlawfully copied were first published through Plaintiffs' sale and distribution of those eyewear products in Venezuela, Colombia, and Mexico." *See* Lampru Aff. (ECF No. 236–8) ¶ 3

In *Mosley*, the Eleventh Circuit considered a very similar statement from a plaintiff in the form of a declaration, and found that it lacked sufficient probative value to prevent summary judgment. The *Mosley* plaintiff similarly denied publication by internet, and insisted the first publication was via a physical disk, providing the declaration and deposition testimony of the author of the work. The testimony stated that the publication of the work occurred on a certain date when it was published on a computer disk. *See Mosley* 694 F.3d at 1310. The Court found that the declaration alone was insufficient to establish that the work was a foreign work because (1) he failed to address distribution and (2) "baldly attests" that the work was "published." *Id.* The Court concluded that the "unsupported, conclusory, and general attestation by [author] that [work] was 'published' lacks probative value, and is insufficient to prevent a grant of summary judgment." *Id.* The Court similarly rejected the *Mosley* author's deposition testimony, holding that Plaintiff "failed to offer significantly probative evidence of distribution, that is, whether the [work] was ever distributed, the breadth of distribution, the purpose of the distribution, and whether the distribution included a transfer of the right of diffusion, reproduction, distribution, or sale" and therefore "no reasonable factfinder could find" that the work was first published when Plaintiff claimed it was. *Id.*

Plaintiff presents even weaker evidence of the first publication here. First, Lampru's testimony that the first publication was not via the website, but at some other undefined point in time, is conclusory and will not prevent summary judgment. The conclusory nature of the statement is especially problematic because "[p]ublication is a legal word of art, denoting a process much more esoteric than is suggested by the lay definition of the term." *Id.* at 1303. It appears that Lampru erroneously equates first publications with first sales. However, even if the first sales took place in those three countries, that is not dispositive of the relevant question because an actual sale is not necessary for publication—rather a mere offer is sufficient. *Id.* (Publication can occur "when an authorized offer is made to dispose of the work in any such manner[,] even if a sale or other such disposition does not in fact occur.").[6] Second, Plaintiffs fail to provide any details about the publication. In fact, Plaintiff's declaration offers even fewer details than the declaration by the *Mosley* plaintiff's declaration because it does not even provide a date that the item was allegedly first published. "Without evidence of the exact timing and geographic extent of first publication, it would be impossible to determine whether the [work] met the statutory definition of a 'United States work,' or was instead a foreign work." *Id.* 1304.

Plaintiffs have not fulfilled either prong of their obligation to prove the first publication of their supposedly foreign work: first, showing "that the method, extent,

---

6. The only additional evidence Plaintiffs provide regarding its first publication similarly indicate that Plaintiffs erroneously equate publication with sale. *See* (ECF No. 236–7) (containing invoices of sales); Expert Report of Ury Fischer (ECF No. 237–1) at 14 ("All of the Designs-in-Suit were first sold to the public (i.e. published) in either Venezuela, Colombia, or Mexico."). These fail for the same reasons. Additionally, an "expert witness may not testify as to his opinion regarding ultimate legal conclusions." *United States v. Long*, 300 Fed.Appx. 804, 814 (11th Cir. 2008).

and purpose of the distribution meets the Copyright Act's requirements for publication," and then "prov[ing] that the publication was, in fact, the first publication, and that the geographic extent of this first publication diverges from the statutory definition of a 'United States work.'" *Id.* at 1305. Plaintiffs thus fall woefully short of their burden of proving that their work is a foreign work under the Copyright Act. *See id.* at 1312 ("[Nonmovant plaintiff] bears the burden of proving compliance with statutory formalities ...."). As a result, "[t]he record reveals a lack of sufficiently probative evidence to determine that [their claimed work] is a foreign work." *Id.* at 1309.

"Without sufficiently probative evidence of [Plaintiff's alleged work] being a foreign work exempt from registration, and without a certificate of registration, [Plaintiff's] infringement suit was over before it began." *Id.*; *see also Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548 ("Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). Because Plaintiffs have not registered a copyright and "cannot demonstrate" that their designs are a foreign work exempt from registration, their "case is doomed." *See Mosley*, 694 F.3d at 1312.

The Court need not address the other issues presented, including whether the designs are copyrightable and the validity of the alleged assignment. Even if the designs were copyrightable and the assignment was proper, Plaintiff could not initiate a suit based on them because they failed to either register the works or show that they are not "United States works." Accordingly, summary judgment in favor of Defendants on Plaintiffs' Copyright Infringement claim (Count I) is appropriate.

### B. Plaintiffs' FDUTPA Claim (Count II)

Plaintiff also alleges that Defendants have violated the Florida Unfair and Deceptive Trade Practices Act ("FDUTPA"), setting forth thirteen claims that fall into five categories: (1) diverting sales and harming Plaintiffs' goodwill (ix, x, xi); (2) misappropriation of business relationships (iv, vi); (3) using photographs of Casa Dimitri's stores to persuade the USPTO to grant Invicta a class 35 registration of the Technomarine Marks (xiii); (4) procuring the brand at the expense of terminating Plaintiffs' licensing agreement (i, ii, iii, v); and (5) copyright infringement (vii, viii, xii). *See* Compl. ¶¶ 185–186.

Defendants argue that summary judgment is appropriate regarding the FDUTPA claims (Count II) because, *inter alia*: (1) they did "nothing wrong" vis-a-vis their purchase of the Technomarine trademarks without assuming obligations under Casa Dimitri's License Agreement; (2) they did not cause Plaintiffs' alleged damages—the constructive termination of the license agreement did; and (3) Plaintiffs' alleged damages stem from their inability to further sell Techno Marine products. Plaintiffs contend summary judgment on their FDUTPA claim is inappropriate because there are genuine issues of material fact as to whether: (1) Defendants' misappropriation of the blueprint of the Plaintiffs' business constitutes an unfair and deceptive trade practice; (2) Defendants' unlawful conduct harmed Plaintiffs; and (3) Plaintiffs have suffered actual damages as a result of Defendants' unlawful conduct.

■ To sustain a FDUTPA claim, a plaintiff must show "(1) a deceptive act or unfair trade practice; (2) causation; and (3) actual damages." *Dolphin LLC v. WCI Cmtys., Inc.*, 715 F.3d 1243, 1250 (11th Cir. 2013). A review of Plaintiffs' thirteen FDUTPA claims, along with the argu-

ments and evidence presented by the parties, reveals that summary judgment is appropriate as to Count II.

### 1. FDUTPA Claims iv, vi, ix, x, xi, and xiii Did Not Cause Actual Harm

 "Proof of actual damages is necessary to sustain a FDUTPA claim." *See Dorestin v. Hollywood Imps., Inc.*, 45 So.3d 819, 824 (Fla 4th DCA 2010). Florida courts consider actual damages, the third element of a FDUTPA claim, to be a "term of art," which does not include "consequential damages." *Diversified Mgmt. Sols., Inc. v. Control Sys. Research, Inc.*, No. 15-81062-CIV, 2016 WL 4256916, at *5 (S.D. Fla. May 16, 2016) (citations and internal quotation marks omitted). "Consequential or special damages are those which do not necessarily result from the injury complained of or which the law does not imply as the result of that injury." *BPI Sports, LLC v. Labdoor, Inc.*, No. 15-62212-CIV-BLOOM, 2016 WL 739652, at *6 (S.D. Fla. Feb. 25, 2016) (citation and internal quotation marks omitted). Lost profits are a "quintessential example" of consequential damages. *Id.*; *see also Nyquist v. Randall*, 819 F.2d 1014, 1017 (11th Cir. 1987). Additionally, "harm in the manner of competitive harm, diverted or lost sales, and harm to the goodwill and reputation" are consequential damages. *Krupa v. Platinum Plus, LLC*, No. 8:16-CV-3189-T-33MAP, 2017 WL 1050222, at *7 (M.D. Fla. Mar. 20, 2017) (citation and quotation marks omitted).

 Three of the thirteen FDUTPA claims fail as a matter of law because the alleged wrongful act causes only consequential damage. Specifically, claims (ix), (x), and (xi), all essentially allege that Defendants have diverted sales and harmed goodwill. These types of damages are expressly not recoverable under the FDUTPA. *See Krupa*, 2017 WL 1050222 at *7.

Plaintiffs' expert report on damages reveals that Plaintiffs frame their injury into four categories: (A) expenditures incurred by promoting and acquiring the product; (B) losses resulting from alleged misappropriation of the distribution network; (C) sales of infringing products; and (D) losses resulting from improper notice of termination. *See* Expert Report from Dana Kaufman (ECF No. 243-1) at 3–5. With the exception of the alleged copyright infringement damages, Plaintiffs claim that all of their damages relate to outlays they made in promoting, developing, and selling a product that they are no longer permitted to sell. Accordingly, with the exception of the copyright infringement damages, all of Plaintiffs' alleged damages stem from Plaintiffs' inability to continue to use the trademarks as a result of the APA. Therefore, only the claims based on copyright infringement (vii, viii, and xii) and the claims based on Defendants' alleged actions in procuring the termination of the License Agreement (i, ii, iii, v) do not fail as a matter of law for failing to show causation.[7]

---

7. The claims regarding misappropriation of Dimitri & Co's business relationships (claims iv and vi) and the claim regarding Defendants' use of photographs of Dimitri & Co.'s stores to secure a class 35 registration (claim xiii) similarly fail: Plaintiffs were not injured because they would not be authorized to continue selling Technomarine products regardless of whether these relationships remained intact or whether Invicta had a class 35 registration. *See Sweeney v. Kimberly–Clark Corpo-* *ration*, 2016 WL 727173, *6 (M.D. Fla. Feb. 22, 2016) ("causation can be resolved by the court where the plaintiff fails to 'provide evidence from which a jury could reasonably conclude that, more likely than not … the conduct of the defendant was a substantial factor in bringing about the result' "). In any case, Plaintiffs provide no proof that these alleged wrongful actions have affected "the market value of [Plaintiff's] products," which

## 2. FDUTPA Claims i, ii, iii, and v Are Unsupported by the Record

A practice is unfair under the FDUTPA if it "offends established public policy" or is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003). A deceptive act occurs when a defendant makes "a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*, 169 So.3d 164, 169 (Fla. Dist. Ct. App. 2015) (citing *Beacon Prop. Mgmt.*, 842 So.2d at 777) (emphasis omitted).

In claims i, ii, iii, and v, Plaintiffs essentially allege that Defendants interfered with their Licensing Agreement by (i) executing the APA with intent to "contract[ ] around" Plaintiffs' licensing rights, (ii) submitting the APA to the Swiss Court appointed receiver in order to "cloak the entire transaction with a veil of legitimacy", (iii) "fail[ing] to notify" Plaintiffs of their "dealings with Technomarine or in the Swiss reorganization proceedings," and (v) "causing" Technomarine to terminate its agreement without a valid legal reason. *See* Compl. (ECF No. 188) ¶ 186.

Even assuming each of these allegations constituted an unfair or deceptive act, these claims fail because Plaintiffs have not adduced any evidence supporting such allegations. There is no record evidence that Defendants intended to "contract[ ] around" Plaintiffs'" rights in an immoral, deceitful, or unscrupulous way. Rather, as this Court has found, the APA is very candid that the buyers did not assume any contractual obligations as a

result of their purchase. *See* Omnibus Order (ECF No. 162) at 14. Nor is there any evidence that the submission of the APA to the Swiss Court appointed trustee was done with intent to "cloak the entire transaction with a veil of legitimacy" or otherwise deceive anyone. There is also no evidence that TM Brands "caused" Technomarine to terminate its licensing agreement.

The allegation that TM Brands "failed to notify" Plaintiffs "of their dealings with Technomarine or their involvement in the Swiss reorganization proceeds" fails because Plaintiff does not explain why Defendants would have a duty to disclose such actions to a third party. *Cf. Hummel v. Tamko Bldg. Prod., Inc.*, No. 615CV910ORL40GJK, 2015 WL 12843907, at *5 (M.D. Fla. Nov. 6, 2015) (A "defendant's knowing concealment or non-disclosure of a material fact may only support an action for fraud where there is a duty to disclose." (internal citation omitted)). Moreover, as this Court has already found, the Defendants did inform Plaintiffs about the Swiss proceedings on April 23, 2015— months before the Swiss bankruptcy's entry of final judgment on July 14, 2015. *See* Omnibus Order (ECF No. 162) at 10–11.

As previously noted, "Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548. Accordingly, these FDUTPA claims fail because there is not sufficient "evidence on which the jury could reasonably find for the [non-

---

is the measure of actual damages. *See BPI Sports, LLC*, 2016 WL 739652 at *6 ("BPI does not present any facts supporting a claim that LabDoor's study has affected the market value of BPI's product. Because this element is lacking, BPI's claim for damages under FDUTPA fails").

movant]." *Liberty Lobby, Inc.*, 477 U.S. at 252, 106 S.Ct. 2505 (1986).

### 3. FDUTPA Claims vii, viii, and xii Are Preempted

■ Finally, the remaining alleged deceptive acts and unfair practices (claims vii, viii, and xii) fail because they are nothing more than a restated copyright infringement claim. Assuming without deciding that Plaintiffs' work is copyrightable, the FDUTPA claims based exclusively on allegations of copying fail because they are preempted by the Copyright Act. The Copyright Act explicitly preempts certain state laws: "[A]ll legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright ... are governed exclusively by" the Copyright Act, and therefore, "no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State." 17 U.S.C. § 301.

As such, the Copyright Act preempts a FDUTPA claim premised on allegations of copying. *See Marc Anthony Builders, Inc. v. Javic Props., LLC*, No. 8:11-CV-00432-EAK, 2011 WL 2709882, at *4 (M.D. Fla. July 12, 2011) (finding that a FDUTPA claim premised on "intentionally and knowingly copying" is preempted by the Copyright Act); *see also M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1494 (11th Cir. 1990) ("A claim for unfair competition based upon allegations of copying, and in the absence of proof of any element of unfair competition other than copying, is clearly pre-empted by the Act."). In *Marc Anthony Builders*, the court held that "the Copyright Act preempts [plaintiff]'s FDUTPA claim because it seeks to recover for the same conduct that allegedly violates the Copyright Act." 2011 WL 2709882 at *4. Notably, the *Marc Anthony Builders* Court found that the plaintiff's copyright claim

failed because that plaintiff did not satisfy the statutory registration requirement. *Id.*

Accordingly, such claims fail as a matter of law and summary judgment in favor of Defendants is appropriate. *See Millennium Travel & Promotions, Inc. v. Classic Promotions & Premiums, Inc.*, No. 608-CV-290-ORL-28KRS, 2008 WL 2275555, at *3 (M.D. Fla. June 2, 2008) (Plaintiffs' "reiteration of the elements of an FDUTPA claim is not enough to save its repackaged copyright infringement claims from preemption.").

### C. Counter–Plaintiff's Counterclaims

In its Counterclaim (ECF No. 194), TM Brands brings nine causes of action against Casa Dimitri, Dimitri & Company Eye Wear, Inc. ("Dimitri Eyewear"), and Dimitri Lampru ("Lampru") (collectively, "Counter–Defendants"): (I) trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); (II) trademark infringement in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (III) unfair competition, false designation of origin and false description in violation of 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (IV) cybersquatting in violation of Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d); (V) statutory injury to business and dilution in violation of Florida Statutes § 495.011 et seq.; (VI) common law unfair competition; (VII) common law unjust enrichment; (VIII) misappropriation and conversion; and (IX) violation of the FDUTPA.

TM Brands argues that it is entitled to a grant of summary judgment as to liability on these counterclaims because (a) summary judgment is appropriate on the trademark claim and (b) all of its claims "rise and fall" with the trademark claim. Counter–Defendants do not contest that the fate of the state law claims are linked

to the fate of the trademark claim, but contend that there are genuine issues of material fact which prevent summary judgment regarding: (1) TM Brands' ownership of the Technomarine trademarks, (2) the extent of the ownership rights that TM Brands received from Technomarine S.A., (3) Counter–Defendants' common law trademark rights based on its use of the Technomarine trademarks in connection with its eyewear products before Technomarine S.A. registered the trademark in the United States, (4) whether Counter–Defendants needed TM Brands' consent to use its common law and contractual rights in the Technomarine trademark, and (5) the likelihood of consumer confusion resulting from Counter–Defendants' purported use of the Technomarine trademarks.

For the reasons below, the Court grants in part and denies in part Counter–Plaintiff's summary judgment motion.

## 1. Counter–Plaintiff's Lanham Act Infringement and Unfair Competition Claims (Counts I, II, III)

As discussed above, Counter–Plaintiff brings Lanham Act claims under 15 U.S.C. §§ 1114 and 1125.[8] "The same set of facts enabling [a plaintiff] to prevail under Section 1114(a)(1) will result in recovery pursuant to Section 1125 .... because Section 1125(a) is broader than Section 1114 in that it covers false advertising or description whether or not it involves trademark infringement." *Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1181 (11th Cir. 1994). Moreover, "the same facts support a cause of action for unfair competition as for trademark infringement; if there is no genuine issue of fact as to trademark in-

fringement, there is none as to unfair competition, either." *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1475 n. 3 (11th Cir. 1991).

■■■ "To prove infringement under 15 U.S.C. § 1114 of the Lanham Act, the holder of a registered trademark must show (1) that the infringer used the mark in commerce, without the trademark holder's consent, and (2) that the use was likely to cause confusion." *Mainstream Advert., Inc. v. Moniker Online Servs., LLC*, No. 16-CV-61316, 2016 WL 4729647, at *4 (S.D. Fla. Sept. 12, 2016); *see also Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 647 (11th Cir. 2007) ("To establish a prima facie case under § 1125(a), a plaintiff must show (1) that the plaintiff had enforceable trademark rights in the mark or name, and (2) that the defendant made unauthorized use of it 'such that consumers were likely to confuse the two.' ").

Pursuant to the undisputed facts, TM Brands satisfies both requirements.

### a) Counter–Defendants Used the Mark in Commerce Without the Trademark Holder's Consent

■■■ This Court previously determined that TM Brands has owned the Technomarine trademark since the date of the APA (March 31, 2015). *See* Omnibus Order (ECF No. 162) at 15 (dismissing trademark infringement claims and finding that "Technomarine sold its rights to the Technomarine Marks to the Defendants."). Specifically, this Court found that Technomarine S.A. owned the trademark and then transferred it to TM Brands via the APA,

---

8. The Counterclaim contains two counts (II and III) premised on 15 U.S.C. Section 1125(a). *See* (ECF No. 194) at 29–37. It appears both counts are premised on violations of 1125(a)(1)(A) because the Counterclaim does not reference false advertising, and Counter–Plaintiffs' summary judgment mo-

tions focus squarely on trademark infringement. In any case, a false advertising claim rests on elements not addressed in the summary judgment brief or in the record. *See Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004).

**1356**

which explicitly exempted TM Brands from fulfilling any contractual obligations. *Id.* TM Brands is also the registered owner of the Technomarine trademark. *See* (ECF No. 195–2) (Federal Registration Nos. 4398263, 4000628, 4000629, 4394401). These "certificate[s] of registration constitute[ ] prima facie evidence of ownership." *Adobe Systems Inc. v. Bea's Hive, LLC,* 2014 WL 4672453 at *8 (S.D. Fla. Sep. 18, 2014) (citing 15 U.S.C. § 1057(b)). Nothing in Counter–Defendants' Response or in the record convinces the Court that its prior finding of ownership is incorrect. The Court addresses each of Counter–Defendants' three arguments in turn.

■ **First,** Counter–Defendants dispute Counter–Plaintiff's ownership of the trademark, arguing that "Technomarine S.A. entered into a naked license with Casa Dimitri Corp. thereby forfeiting all rights to the Technomarine trademarks relating to the eyewear products" prior to transferring such rights to TM Brands. *See* Response (ECF No. 241) at 4. Specifically, Counter–Defendants argue that Technomarine S.A. failed to "implement any measures to control or supervise the quality of Casa Dimitri Corp.' eyewear products" and "never attempted to terminate the licensing relationship with Casa Dimitri Corp. as a result of its failure to obtain Technomarine S.A.'s approval of the eyewear products." *Id.* at 5. As a result, Counter–Defendants contend, "Technomarine S.A. entered into a naked license with Casa Dimitri Corp. thereby forfeiting its rights to the Technomarine trademarks relating to the eyewear products." *Id.*

Although an owner of a trademark may "abandon[ ][his] mark through 'naked licensing,' or the failure to properly supervise [his] licensee's use of the mark," the claim of abandonment "turns on when the lack of supervision occurred." *Nguyen v. Biondo,* 508 Fed.Appx. 932, 935 (11th Cir. 2013) (alterations in original) (citations omitted). The Eleventh Circuit has explicitly held that a licensee "is estopped to contest the validity of the licensor's title during the course of the licensing arrangement," but the licensee may "challenge the licensor's title on facts which arose *after* the contract has expired." *Id.* (emphases added).

Notably, the license agreement at issue here only terminated once TM Brands possessed ownership of the trademark. *See* Omnibus Order (ECF No. 162) at 15 ("Technomarine sold its rights to the Technomarine Marks to the Defendants."). Moreover, the record reflects that when Casa Dimitri renewed its license agreement in 2013 with Technomarine, S.A., it expressly recognized Technomarine S.A.'s ownership of the marks. *See* 2013 License Agreement (ECF No. 188–1) at ¶ 15.1 ("Licensee hereby acknowledges Licensor's right of ownership over the Trademark and undertakes to use the Trademark exclusively in his capacity as Licensee and in accordance with Licensor and the terms of this Agreement."). Casa Dimitri has, therefore, "by virtue of the agreement," recognized Technomarine's ownership. *Nguyen,* 508 Fed.Appx. at 935 (citation omitted).[9] Counter–Defendants' abandonment defense is foreclosed by these undisputed facts. *See id.* (affirming grant of summary judgment on abandonment defense where plaintiff signed sales agreement that expressly recognized defendant's ownership of the mark); *Prof'l Golfers Ass'n of Am. v. Bankers Life &*

**9.** In fact, according to Casa Dimitri itself, Casa Dimitri was a continuous licensee from approximately 2004 to at least March 31, 2015—the date of the APA whereby TM Brands purchased the marks in the Swiss insolvency proceeding. *See* Compl. (ECF No. 188) ¶¶ 36–37, 66; *see also* Lampru Dep. (ECF No. 254–2) at 35:19–36:6 ("I am an exclusive licensee for Technomarine for the past ten, twelve years").

*Cas. Co.*, 514 F.2d 665, 671 (5th Cir. 1975) ("[T]he facts upon which [licensee plaintiff] relies arose during the course of its ... agreement with the [defendant licensor], so it is estopped to argue abandonment."); *see also Westco Grp., Inc. v. K.B. & Assocs., Inc.*, 128 F.Supp.2d 1082, 1089 (N.D. Ohio 2001) ("[T]he doctrine of licensee estoppel bars a licensee from asserting a naked licensing defense" regarding its own license because "a licensee claiming that its own license is a naked license essentially seeks to benefit from its own misfeasance").

**Second,** Counter–Defendants argue that the presumption of valid ownership created by TM Brands' and Technomarine S.A.'s USPTO registration certificates (ECF No. 195–2) is "overcome by the record evidence demonstrating that Counter–Defendants used the Technomarine trademarks to sell and distribute eyewear products in the United States before Technomarine S.A. registered the Technomarine trademark with the USPTO." *See* Response (ECF No. 241) at 6. Specifically, Counter–Defendants argue that "as early as May, 2007, over four years before Technoamrine [sic] S.A. registered the Technomarine trademarks with the USPTO, Counter–Defendants were selling and distributing Technomarine eyewear in the United States." *Id.*

This argument fails as a matter of law because, by Counter–Defendants' own admissions, Casa Dimitri was a licensee prior to, and during, its use of the marks. *See* Compl. (ECF No. 188) ¶ 36 ("In 2004, Technomarine S.A. agreed to allow Dimitri & Co. to develop, manufacture, market, sell, and service a line of eyewear products in South America, Central America, the Caribbean, Mexico and the United States."); *id.* ¶ 37 ("Technomarine SA granted Dimitri & Co. an exclusive license of the Technomarine Marks"); Deposition Transcript of Demetrio Lampru, (ECF No.

254–2) 36:5–10 ("I am an exclusive licensee for Technomarine for the past ten, twelve years. ... I've performed as such. I have acted as such. ..."); *see also* April 28, 2005 License Agreement (ECF No. 241–2); January 21, 2008 License Agreement (ECF No. 241–3); January 1, 2013 License Agreement (ECF No. 239–3).

Although "registration of a mark, unaccompanied by prior use, does not create ownership," *Compton v. Fifth Ave. Ass'n, Inc.*, 7 F.Supp.2d 1328, 1331 (M.D. Fla. 1998), "the use by a licensee may inure to the benefit of the owner for purposes of establishing the mark." *Cotton Ginny, Ltd. v. Cotton Gin, Inc.*, 691 F.Supp. 1347, 1354 (S.D. Fla. 1988); *see also Clayton v. Howard Johnson Franchise Syst., Inc.*, 730 F.Supp. 1553, 1560 (M.D. Fla. 1988) ("The law is clear that while a license is in effect, use of a licensed mark by a licensee inures to the benefit of the licensor."). As a result, from its use, "the licensee, itself, retains no independent right in the mark." *Cotton Ginny, Ltd.*, 691 F.Supp. at 1354; *see also Kroma Makeup EU, Ltd. v. Boldface Licensing ± Branding, Inc.*, No. 6:14-CV-1551-ORL, 2015 WL 1708757, at *4 (M.D. Fla. Apr. 15, 2015) ("Like any license, the licensor of a trademark transfers less than his whole ownership interest in the mark to the licensee" therefore "by taking a license, the licensee necessarily acknowledges that it has no ownership interest in the trademark, but has the right to use the mark with the licensor-owner's permission."). As such, a licensor may acquire "rights to those marks through his license to" a licensee and licensee will not gain "any ownership rights" in the marks because its use of those trademarks inures to the benefit of licensor. *SM Licensing Corp. v. U.S. Med. Care Holdings LLC*, No. 07-20293-CIV, 2007 WL 2051009, at *14 (S.D. Fla. July 13, 2007). Accordingly, as a licensee, Counter–Defendants' use of

the marks does not give them ownership over those marks.

██ Moreover, a "licensee is estopped to contest the validity of the licensor's title during the course of the licensing arrangement," and may only "challenge the licensor's title on facts *which arose after the contract has expired.*" *Nguyen*, 508 Fed. Appx. at 935 (emphasis added) (internal quotation marks and citation omitted). Counter–Defendants' argument necessarily attacks the validity of Counter–Plaintiffs' ownership in the marks during the time it was a licensee, and it is therefore estopped.

**Third**, although Counter–Defendants do not contend that they received consent from TM Brands to use the marks,[10] Counter–Defendants argue that they did not need TM Brands' consent for two reasons: (1) Counter–Defendants had senior rights in the marks because they were the first to use them; and (2) the License Agreement permitted a six month sell off period. *See* Response (ECF No. 241) at 7–9.

██ The first argument fails as a matter of law, as discussed above, because a licensee's use of marks does not confer ownership rights to the licensee. *See, e.g., Cotton Ginny, Ltd.*, 691 F.Supp. at 1354 ("the licensee, itself, retains no independent right in the mark"); *SM Licensing Corp.*, 2007 WL 2051009 at *14 (a licensor may acquire "rights" to trademarks through its licensee's use, while the licensee will not gain "any ownership rights" in the marks).

The second argument—that Defendants had continuing rights to sell Technomarine product pursuant to the License Agreement's six month sell off period—similarly fails. First, TM Brands was not a party to the relevant License Agreement. *See* January 1, 2013 License Agreement (ECF No. 239–3). Second, for the reasons discussed in its prior orders, it is clear that the Licensing Agreement (along with all of its rights and obligations) was not assumed in the APA. *See* Omnibus Order (ECF No. 162) at 14 (finding "the License Agreement was terminated and the APA explicitly stated that the buyers did not assume underlying contracts when purchasing the trademarks."); Order Denying Motion to Reconsider (ECF No. 214) at 2–3 (reaffirming comity analysis notwithstanding arguments regarding nature of Swiss proceeding). Rather, "Casa Dimitri's rights under the licensing and distribution agreements had been terminated by the APA upon the sale of the Technomarine marks to Defendants." Report and Recommendation (ECF No. 214) at 4. Accordingly, Counter–Defendants needed TM Brands' consent or authorization in order to use the Technomarine marks.

Finally, the Court finds that there is no genuine issue of fact that Counter–Defendants used the Technomarine marks after March 31, 2015—the date of the APA, which terminated their right to do so without consent. For example, it is undisputed in June 2016, Counter–Defendants sold Technomarine eyewear to Garagewatches. *See* CDs' 56.1 ¶ 11 ("Counter–Defendants admit that in June, 2016, ... Counter–Defendants sold Technomarine eyewear products to Garage Watches [sic]."); *see also* Lampru Dep. (ECF No. 240–6) at 503:17–23. Additionally, ledgers of Counter–Defendants' sales in 2015, 2016 and 2017 appear to reflect sales of Technomarine branded products. *See* Ex. B (ECF No. 228–02); C (ECF No. 228–03); D (ECF No. 228–03). Finally, Lampru has admitted that one large sale took place on

---

10. Nor could they. The record reflects multiple letters expressly prohibiting Counter–Defendants from selling any such products. *See* Ex. D (ECF No. 195–4); Ex. E (ECF No. 195–5); Ex. F (ECF No. 195–6).

March 21, 2017 to one of Casa Dimitri's retailers. *See* Lampru Dep. (ECF No. 240–6) at 527:3–15.

In opposition, Counter–Defendants provide Lampru's June :8, 2017 deposition testimony indicating that Counter–Defendants are not currently selling Technomarine products, *id.* at 434–37, 525–26; and deposition testimony ·from two of its retailers indicating that· the sales on the 2017 ledger consist of "small and isolated sales of spare parts and repair services." *See* CDs' 56.1 ¶ 12 (citing Nemer .Dep. (ECF No. 240–8) at 40; Soto Dep. (ECF No.. 241–1) at 90–93). However, this deposition testimony does not create a genuine issue of a material fact. Rather the relevant material fact is whether Counter–Defendants have sold such products without consent. It is undisputed that the answer to that question is affirmative. Accordingly, these disputed factual issues are not material and will not prevent a grant of summary judgment.[11]

### b) Counter–Defendants' Use Was Likely to Cause Confusion

The likelihood of confusion element is also satisfied. A claim for trademark infringement requires ·that the defendants' use "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial ac-

tivities by another person ...." 15 U.S.C. § 1125(a)(1)(A).

Generally, courts engage in a seven-factor assessment of whether a likelihood of confusion exists under both Sections 1114 and 1125. *See Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 648 (11th Cir. 2007) ("With respect to the second element, we consider· seven factors in assessing whether or not the 'likelihood of confusion' exists ...."); *Ross· Bicycles, Inc. v. Cycles USA, Inc.*, 765 F.2d 1502, 1503–04 (11th Cir. 1985) (explaining that the likelihood of confusion factors under § 1125(a) are "identical to the factors relevant to establishing a likelihood of confusion with respect to trademark infringement under 15 U.S.C. § 1114.").

 "However, the[se] factors 'are more .geared towards comparing two distinct, albeit similar, marks.'" *C=Holdings B.V. v. Asiarim Corp.*, 992 F.Supp.2d 223, 240–41 (S.D.N.Y. 2013) (internal citation omitted). "By contrast, application of the factors is 'unnecessary' where .use of an identical mark—that is, a counterfeit mark—is at issue."[12] *Id.* This is because such a mark is "inherently confusing," thus "consumer confusion is presumed in such cases." *Id.* Similarly, some courts have found that "[w]hen an ex-licensee continues to use a mark after. its license expires, likelihood of confusion .is established as a matter of law." *See L & L Wings, Inc. v. Marco-Destin, Inc.*, 676 F.Supp.2d 179,

---

**11.** Additionally, the Court notes that Counter–Plaintiffs claim to have discovered additional sales that occurred as late as after the close of discovery on May 25, 2017. *See* Motion to Serve Subpoena Outside Discovery Period (ECF No. 260).

**12.** Counter Defendants incorrectly argue that the Magistrate Judge has already rejected this principle. *See* Response (ECF No. 241) at 9–10. Rather, Judge McAliley based her finding that that Counter–Plaintiffs had not estab-

lished irreparable harm on (1) Counter–Plaintiff's failure to articulate what irreparable harm would inure in the absence of a preliminary injunction, (2) the lack of evidence that Counter–Defendants continued to engage in sales, and (3) Counter–Plaintiff's delay in pursuing the preliminary injunction. *See* Report (ECF No. 214) at 9–12. In fact, Judge McAliley's only discussion of confusion involved a footnote rejecting Counter–Defendants' argument premised on TM Brands's not using the mark. *See id.* at 9 n.5.

188 (S.D.N.Y. 2009); *Burger King Corp. v. Agad*, 911 F.Supp. 1499, 1504 (S.D. Fla. 1995) (The "likelihood of confusion is an inevitable result of the concurrent use of the subject trademark." (citation and internal quotation marks omitted)); *see also Monsanto Co. v. Campuzano*, 206 F.Supp.2d 1252, 1262 (S.D. Fla.), *modified*, 206 F.Supp.2d 1270 (S.D. Fla. 2002) ("presum[ing] that the counterfeit items caused public confusion in the marketplace, as the counterfeit marks and the genuine marks [were] substantially identical both in design and use and it [was] undisputed that the counterfeit marks were sold to the public.").

Even without this presumption, however, the Court finds no genuine issue of material fact regarding the likelihood of confusion. Counter–Defendants' own allegations in this case noted the "overwhelming evidence that Defendants have used the Technomarine Marks to create, manufacture and sell *substantially similar, if not identical*, eyewear products, which they sell to the same customers and in the same markets as Dimitri & Co." *See* Plaintiff's Renewed Motion for Preliminary Injunction (ECF No. 133) at 17 n.6; *see also id.* at 17 (discussing the other factors in favor of finding likelihood of confusion). In such situations, evidence of actual confusion is not necessary. *See King Ranch, Inc. v. King Ranch Contractors, LLC*, 2013 WL 2371246 at *9 (M.D. Fla. May 30, 2013).

Moreover, there is undisputed evidence that the Counter–Defendants' customers exhibited actual confusion, which is one of the most important factors, *see Midway Servs., Inc.*, 508 F.3d at 650 ("[t]he type of mark and evidence of actual confusion are the most weighty of consid-

erations" (alteration in original)); *see also Playboy Enterprises, Inc. v. Frena*, 839 F.Supp. 1552, 1561 (M.D. Fla. 1993) ("[I]f evidence of actual confusion is available, it is so highly probative of likelihood of confusion that it can rarely be ignored"). For example, Garagewatches authored a letter to Amazon explaining that it acquired Technomarine sunglasses from Dimitri & Co. on or about June 17, 2016 based on Counter–Defendants' representation that it held a valid license to sell the sunglasses. *See* Letter from Garagewatches (ECF No. 228–01).[13] Additionally, Marita Belfiore, one of Counter–Defendants' retailers, testified that she believed (as of the date of the June 5 2017 deposition) that Dimitri owned the Technomarine logo and the word "Technomarine" because he was selling her the products. *See* Belfiore Dep. (ECF No. 228–7) at 21:21–25. These customers believed that Dimitri—even after TM Brands' March 31, 2015 purchase of the Technomarine marks—still had permission or was otherwise authorized to sell Technomarine product.

In opposition, Counter–Defendants provide deposition testimony from Mr. Nemer and Mr. Soto purporting to rebut the inference that those two retailers exhibited actual confusion. *See* CDs' 56.1 at ¶ 17 (citing Nemer Dep. (ECF No. 240–8) 23–24; Soto Dep. (ECF No. 241–1) at 40–25, 64–65). Counter–Defendants also provide Mr. Lalo's deposition testimony that he did not possess any evidence that would substantiate a confusion claim. See *id.* ¶ 18 (citing Lalo Dep. (ECF No. 240–1) at 198–201). But even if this testimony creates genuine questions of fact regarding whether those two retailers were confused about

---

**13.** The Court rejects Counter–Defendants' attempts to recharacterize this letter in their Response (ECF No. 239) ¶ 16. Although the Court draws every inference in the non-movant's favor, the plain language of this letter is clear and permits no other interpretation.

the trademarks and whether Counter–Plaintiff at the time of the deposition possessed information regarding customer confusion—neither of these facts are material. Rather, the "test considers . . . whether defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods." *L & L Wings, Inc.*, 676 F.Supp.2d at 187. Such disputed factual issues are not material and will not prevent this Court from granting summary judgment in light of the undisputed material facts noted above.

Accordingly, the Court finds that there is no genuine issue of material fact that Counter–Defendants are liable for trademark infringement and unfair competition under Sections 1125(a) and 1114(1).

## 2. Counter–Plaintiff's Lanham Act Cybersquatting Claim (Count IV)

Counter–Plaintiff also brings a claim for cybersquatting pursuant to Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d) (the "Anticybersquatting Consumer Protection Act" or "ACPA") (Count IV). Counter–Plaintiff contends that all of its claims "rise and fall" together, thus there is no need for a "claim-by-claim" analysis. Counter–Plaintiff's Motion (ECF No. 228) at 11. However, Counter–Plaintiff provides no legal support for the argument that a cybersquatting claim under Section 1125(d) succeeds merely because a trademark claim under Section 1125(a) or 1114(1) does. The Court is aware of none.

In relevant part, Section 1125(d) establishes liability for a person who "has bad faith intent to profit" from the trademark that another person owns, and "registers, traffics in, or uses a domain name that" is "identical or confusingly similar" to a mark that is "distinctive at the time of registration of the domain name." 15 U.S.C. § 1125(d)(1)(A). "There are three statutory conduct hooks that can land a defendant within the purview of the ACPA: 'register[ing],' 'traffic[king] in,' and 'us[ing]' a domain name." *Jysk Bed'N Linen v. Dutta–Roy*, 810 F.3d 767, 776 (11th Cir. 2015) (citing 15 U.S.C. § 1125(d)(1)(A)). A defendant, therefore, will violate the ACPA if it commits in bad faith one of these three actions with respect to a domain name that is identical or confusingly similar to a distinctive mark. *Id.* The statute provides a list of nine factors that courts may consider when determining whether the defendant "ha[d] a bad faith intent to profit from th[e] mark." *Id.*[14]

Importantly, there is also a safe-harbor provision in the ACPA that provides that "[b]ad faith intent . . . shall not be found in

---

14. Those factors are whether: 1. the defendant has a "trademark or other intellectual property rights" in the domain name; 2. the domain name refers to the legal name of the defendant; 3. the defendant ever used the domain name "in connection with the bona fide offering of any goods or services"; 4. the defendant has a "bona fide noncommercial or fair use of the mark in a site accessible under the domain name"; 5. the defendant has an "intent to divert consumers" from the mark owner's website to his own, either for commercial gain "or with the intent to tarnish or disparage the mark," when that diversion could cause harm to the mark owner's good-

will; 6. the defendant offers to transfer or sell the domain name for financial gain when he has not used or had an intent to use the domain name in connection with "the bona fide offering of any goods or services"; 7. the defendant provides "material and misleading false contact information when applying for the registration of the domain name" or the defendant "intentional[ly] fail[s] to maintain accurate contact information"; 8. the defendant acquired multiple domain names that the defendant knows are identical or confusingly similar to distinctive marks; and 9. the mark is distinctive or famous. 15 U.S.C. § 1125(d)(1)(B)(i).

any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii).

■ Drawing all inferences in favor of the non-moving party, the Court finds that there is a genuine issue of material fact regarding whether Counter–Defendants' reasonably believed that the use of the domain name was lawful while Counter–Defendants used it. Lampru testified that he shut down one of the two websites (http://www.technomarine-eyewear.com/home.aspx) within days of the Court's Omnibus Order because the Omnibus Order clarified that he lacked the rights to sell via that website. See Lampru Dep. (ECF No. 228-6) at 494:6–21; see generally id. at 491:14–494:21. Regarding the other website (http://www.technomarinele.com/), Lampru testified that its existence was "fully known" by Technomarine, that it had no sales since early 2015, and that it's continued existence was an "oversight" corrected by the time he took down the site in 2016. See id. 495:5–496:14.

The Court finds Lampru's belief in the lawfulness of Counter–Defendants' use of these websites to be reasonable because the issuance of the Omnibus Order was the first time it became legally clear that the APA in fact terminated Counter–Defendants' rights under the License Agreement. See generally (ECF No. 162); cf. Report and Recommendation (ECF No. 155) ("This is not the time for the Court to make a final determination of the scope of the rights to the disputed marks that Plaintiff received under the License Agreement."). Accordingly, a genuine issue of material fact remains and the Court cannot grant summary judgment on this claim.

### 3. Counter–Plaintiff's State Law Claims (Counts V–IX)

Counter–Plaintiff also lodges the following statelaw claims against Counter–Defendants: (V) statutory injury to business and dilution in violation of Florida Statutes § 495.011 et seq.; (VI) common law unfair competition; (VII) common law unjust enrichment; (VIII) misappropriation and conversion; and (IX) violation of the FDUTPA. Counter–Plaintiff contends that all of its claims "rise and fall" together, thus there is no need for a "claim-by-claim" analysis. Counter–Plaintiff's Motion (ECF No. 228) at 11. Counter–Defendants do not contest this proposition.

■ Certain state law claims are sufficiently similar to Lanham Act claims such that the legal analysis for Lanham Act claims applies to those state law claims. This is true for Counter–Plaintiff's claims of unfair competition (Count VI) and FDUTPA (Count IX). See Suntree Techs., Inc. v. Ecosense Int'l, Inc., 693 F.3d 1338, 1345 (11th Cir. 2012) (affirming district court's conclusion that "the legal analysis is the same" for "violations of the Lanham Act, FDUTPA, and Florida state common law for infringement and unfair competition."); Gift of Learning Found., Inc. v. TGC, Inc., 329 F.3d 792, 801 (11th Cir. 2003) ("[T]he analysis of Florida statutory and common law claims for trademark infringement and unfair competition is the same as under the federal trademark infringement claim"); Coach, Inc. v. Swap Shop, Inc., 916 F.Supp.2d 1271, 1283 (S.D. Fla. 2012) ("FDUTPA claim 'rises or falls' on the success of its infringement claims"). Accordingly, because the Court has already granted summary judgment as to liability on the Lanham Act infringement claims, it hereby grants summary judgment as to Counter–Defendants' liability under the state law claims for unfair competition (Count VI) and FDUTPA (Count IX).

However, Counter–Plaintiff provides no support for the proposition that its state law claims for dilution (Count V), unjust enrichment (Count VII), and conversion (Count VIII) use the same analysis employed by the Court to resolve the Lanham Act infringement claims. In fact, the analysis is distinct.[15] Counter–Plaintiff has proffered no arguments and marshalled no evidence to meet its burden of showing that no genuine issue of material fact exists as to each of the elements of these claims. *See Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548 ("a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."). Accordingly, the Court will not grant summary judgment as to Counts V, VII, or VIII.

**15.** The claim for dilution under Florida law (Count V) "differs from infringement in that it does not necessarily depend on either competing goods or likelihood of confusion." *Florida Int'l Univ. Bd. of Trustees v. Florida Nat. Univ., Inc.*, 91 F.Supp.3d 1265, 1286 (S.D. Fla. 2015), *aff'd sub nom. Florida Int'l Univ. Bd. of Trustees v. Florida Nat'l Univ., Inc.*, 830 F.3d 1242 (11th Cir. 2016). Indeed, to "prevail on a dilution claim, the plaintiff must show that: (1) the plaintiff's mark is famous; (2) the defendant used the plaintiff's mark after the plaintiff's mark became famous; (3) the defendant's use was commercial and in commerce; and (4) the defendant's use of the mark has likely caused dilution." *Id.* Under Florida law, the plaintiff must also produce proof that the use of a trademark decreases the plaintiff's commercial value. *See Freedom Sav. and Loan Ass'n v. Way*, 757 F.2d 1176, 1186 (11th Cir.1985).
There are three elements for a claim of unjust enrichment: "(1) plaintiff has conferred a benefit on the defendant, who has knowledge

## IV. CONCLUSION

For the foregoing reasons, it is ORDERED AND ADJUDGED as follows:

1. Defendants' Motion for Summary Judgment (ECF No. 229) is GRANTED.

2. Counter–Plaintiff's Motion for Summary Judgment (ECF No. 228) is GRANTED IN PART and DENIED IN PART as set forth above.

Any remaining issues, including liability for remaining claims and damages, will be determined at trial.

**DONE and ORDERED** at Miami, Florida, this 15th day of September, 2017.

thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff." *Grove Isle Ass'n, Inc. v. Grove Isle Assocs., LLLP*, 137 So.3d 1081, 1094 (Fla. 3d DCA 2014) (internal citation omitted).
And, with respect to conversion, "[i]t is well settled that a conversion is an unauthorized act which deprives another of his property permanently or for an indefinite time." *Senfeld v. Bank of Nova Scotia Tr. Co. (Cayman) Ltd.*, 450 So.2d 1157, 1160–61 (Fla. 3d DCA 1984) (citations and footnote omitted). "[T]he essence of conversion is not the possession of property by the wrongdoer, but rather such possession in conjunction with a present intent on the part of the wrongdoer to deprive the person entitled to possession of the property, which intent may be … shown by demand and refusal." *Id.* at 1161 (footnote omitted).